FILED

NOV - 7 2022
Via email
Clerk, U.S. Bankruptcy Court
Middle District of Florida
Tampa Division

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA - TAMPA DIVISION

IN RE:

CASE NO.: 8:22-bk-02494-CPM
CHAPTER 13

JENNIFER KAY MARLOW AKA JENNIFER
MARLOW AKA JENNIFER KAYE MARLOW,

Petitioner-Debtor

**DEBTOR'S REPLY TO CREDITOR'S
RESPONSE IN OPPOSITION TO
DEBTOR'S AMENDED MOTION
FOR RELIEF FROM
SUPPLEMENTAL ORDER
DISMISSING CASE WITH
PREJUDICE ON SEPTEMBER 30,
2022**

NEW PENN FINANCIAL LLC, D/B/A/
SHELLPOINT MORTGAGE SERVICING,
U.S. BANK TRUST NATIONAL ASSOCIATION
GMAC MORTGAGE LLC

Respondent

_____/

COMES NOW, JENNIFER KAY MARLOW, AKA JENNIFER MARLOW, Debtor, to file this

instant and timely Reply to Creditor's Response in Opposition To Debtor's Motion for Relief from

Supplemental Order Dismissing Case With Prejudice on September 30, 2022.

The Response on 10/25/2022 shows at page one that the 'Creditor opposes the requested relief

to the extent it appears Debtor is seeking once again for Creditor to assert its position as a secured

Claim and have the dismissal vacated.'

1

At page (2) of (6) the Creditor states: "The instant Amended Motion seeks to again simply rehash the same arguments, again attempt to invalidate a mortgage or challenge the Creditor's claim and interest in the property in direct contravention to the Rooker-Feldman doctrine."

At page (4)of (6) the Creditor again asserts its position stating:

"The Debtor in her Amended Motion for Reconsideration sets forth no legal basis in order to vacate the dismissal order, instead again re-arguing those matters adjudicated by first the circuit court in the foreclosure case, and then the appellate court. The arguments set forth as to the foreclosure action in Debtor's motion have been considered, reviewed and denied. In applying the Rooker-Feldman doctrine, a litigant should not be able to challenge state court orders in federal courts as a means of relitigating matters that have been considered and decided by a court of competent jurisdiction."

Case law though speaks to the effect that exceptions exist to Rooker-Feldman estoppel.

" ;When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound `not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter that might have been offered for that purpose.'" Sunnen, 333 U.S. at 597, 68 S.Ct. at 719 (quoting Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1876)); see also Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980). Final state court judgments are accorded the same preclusive effect in federal court as they are due in the courts of the state in which the judgment was rendered. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984).

Thus, in determining the preclusive effect of the final judgment against PNS and the Dietels, the

court must apply Florida's law on this issue. There are four prerequisites which must be satisfied before preclusive effect can attach to a final judgment under Florida law:

"(1) identity of the thing sued for;

(2) identity of the cause of action;

(3) identity of the parties; and (emphasis underline mine)

(4) identity of the quality in the person for or against whom the complaint is made."

Adams v. Sewell,946 F.2d 757, 762 (11th Cir.1991), overruled on other grounds by McKinney v. Pate, 20 F.3d 1550 (11th Cir.1994).Puff 'n Stuff of Winter Park v. Fed. Trust Bank, 945 F.Supp. 1523 (M.D. Fla. 1996)

    The alleged defendant is now going to again assert an indirect claim on behalf of the silent real-party- in- interest.

    That party is the U. S. Government. Presumably judicial officer(s) have to pay attention.

    In Senate document (43) the U.S. Senate declared the ultimate ownership of all property is in the state. Senate Resolution (62) from April 17, 1933 formed Senate document (43). What this simply means is that the plaintiff's foreclosure all the way back is patently **'ultra vires'** for (failing) to name the real party in interest. Remionder(s) can be asserted also under the Lieber code.

    Therefore, the cause of action, complaint, which allegedly led to a Uniform Final Judgment which at line (15.) mandates the Judgment cures any final title defects, is now fraudulent and defective for not defending the u.s. government's priority interest in the real property at bar. In short, at (3) above the identities of the parties was and is insufficient/defective/and/or deceptive to the point the action at bar is voidable and void from inception.(see) Puff 'n Stuff, Id.

3

There was <u>no adjudication</u> on the merits of the u.s. government's priority interest. This burden of proof lied, and now lies on the moving party, the plaintiff(s).

The Uniform Final Judgment of Foreclosure recorded 10/28/2019 bears the full Faith and Credit of the United States once a presiding Judge signs it. However, the old saying at NASA is: 'Houston we have a Problem". At section (8)(c): the "signed" Summary Uniform Final Judgment says:

**c. If the United States of America is a defendant, it shall have the right of redemption pursuant to 28 U.S.C. Section 2410 (c), from the date of the foreclosure sale.**

The term "If' is more than misleading. The terms "is a defendant" is even worse. The U.S. Senate declared the U.S. Government is the title holder, which makes 'It' the Plaintiff.

But, it was not named in the originating complaint for foreclosure as the plaintiff.

GMAC Mortgage LLC was the plaintiff then.

The United States of America was only named at line (3) of the originating complaint as the Internal Revenue Service had a claim on the real property at bar. And the Internal Revenue Service is <u>not</u> under the U.S. of America it is only under the "United States".

The U.S. Constitution isolates the two federal governments even before the third federal corporate government was formed in 1861, in Article IV. The Union of States, is not nor ever has been the "United States" (10) Miles Square.

The Union of States back then was the (13) colonies.

Naming the United States of America as the entity which holds the Internal Revenue Service is a mistake at law. Teh complaint then is full of jurisdictional defects and deficiencies. Please note:

4

In the (50) Republic states of America, there is a system of law and order. Any authority delegated to any branch government must be re-delegated down to the employee or agent actually exercising that authority and must be provided immediately upon the Citizen's request. Without evidence that such authority actually exists as a matter of law, anyone with a badge could seize the property of any Citizen. The Commerce Clearinghouse Internal Revenue Manual, Volume 1 states, as follows:

"Each regional and district office and service center should maintain at least one complete and annotated file of all Delegations of Authority(s) [DOA] made to such office and by such office."

The Reorganization Act of June 20, 1949, 63 Stat 203, Ch 226, authorized the President to reorganize the executive agencies (which were created pursuant to Art. 1, Sec 8, Cl. 17 and Article 4, Sec. 3, Cl. 2 of the Constitution).

The Reorganization Plan, No. 26 of 1950 (Fed. Reg. 4935, 64 Stat. 1280, codified in the annotations to 5 U.S.C. Sec. 903 divested the Commissioner of the Internal Revenue of all prior authority, which was delegated to the Department of the Treasury (which was not and is not the Department of the Treasury of the United States but is tied to the International Monetary Fund or IMF). Treasury Department Order No. 150-42, dated July 27, 1956, 21 Fed. Reg. 5852 then delegated the following authority to the Commissioner:

"The Commissioner shall, to the extent of the authority vested in him, provide for the administration of United States internal revenue laws in the Panama Canal Zone, Puerto Rico and the Virgin Islands."

On Feb. 27, 1986 the Federal Register (*51 Fed. Reg. 9571*) published the following Treasury Department Order No. 150-01:

"The Commissioner shall, to the extent of authority otherwise vested in him, provide for the administration of the United States internal revenue laws in the U.S. Territories and insular possessions and other authorized areas of the world." [These areas include countries with which the U.S. has Tax Treaties in force and **DO NOT include** the 50 Republic states.]

"For federal tax purposes, regulations govern." - Lyeth v. Hoey, 305 U.S. 188, 59 S. Ct

……………………………………………..

Again, "Houston we have a problem".

The originating complaint to activate the cause of action (foreclosure) did not name the real-party-in-interest', the U.S. government. And it named the USA as a claimant when it is not a claimant.

Defect(s) in the originating Complaint are reviewable under the statute of frauds.

The Rooker-Feldman doctrine is not, and cannot be a res judicata conclusion when

JURISDICTION CAN BE CHALLENGED AT ANY TIME.

In researching other issues this alleged defendant found that the Florida Appeals court ruled:

The Fourth District has consistently taken the position that res judicata does not prevent mortgagees from foreclosing on a mortgage in successive foreclosure cases when the alleged dates of default are different. See Singleton, 840 So.2d at 356; Capital Bank v. Needle, 596 So.2d at 1138; see also Olympia Mortgage Corp. v. Pugh, 774 So.2d 863, 867 (Fla. 4th DCA 2000) ("A comparison of the two foreclosure actions reveals that the facts necessary to establish a default in the first foreclosure action differ from the facts necessary to establish a default in the second foreclosure action."); State Street Bank & Trust Co. v. Badra, 765 So.2d 251, 254 (Fla. 4th DCA 2000) ("The doctrine of res judicata has no applicability where there was no adjudication on the merits in the first suit and where the relief in the second suit was not the same relief sought in the first suit.").
Singleton v. Greymar Assoc., 882 So.2d 1004 (Fla. 2004).

There was no adjudication on the first suit on the merits of the plaintiff naming the UNITED STATES OF AMERICA, and not naming the UNITED STATES or the UNITED STATES OF AMERICA under U.S Senate Document (43).

Furthermore GMAC Mortgage LLC invested nothing in the real property at bar. Prior to that the original Bank Lender invested nothing into the real property at bar, and cannot show document FR2900 to validate the Bank Lender posted a matching collateral deposit for the credit it received upon exchange of the promissory note at the origin of the mortgage.

The Debtor filed her Motion to Determine Secured Status on 09/21/2022 recorded at docket #61. The face of the Debtor's Motion shows that 30 days was available for the alleged Creditor(s) to Object and to Schedule a Hearing. On 09/21/22 a Hearing was held however there is no evidence on the docket that the alleged creditor(s) filed an Objection to the Motion by the Debtor, Id.. Additionally there is no evidence the alleged Creditor filed an Objection to the Debtor's Motion, Id., with the alleged Creditor including any affidavit of truth backing their alleged position as Creditor(s).

On 09/22/2022 the Court entered an Order denying Debtor's Motion to Determine Secured Status. Under Bankruptcy Rule 9024 the court looks to Federal Rule of Civil Procedure 60(b) when applied and argued for by the Debtor. To wit:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;

7

(5) the judgment has been satisfied, released, or discharged: it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Pursuant to Local Rule 3012-1 was to include such content as follows: To Wit:

MOTIONS TO DETERMINE SECURED STATUS – SERVICE (a) Content. The title of a motion to determine secured status shall include the name of the affected creditor. The motion shall identify the creditor's loan using the last four digits of the loan number and shall sufficiently identify the collateral to be valued (e.g., legal description of real property or VIN of vehicles).

The Order Denying the Motion to Determine Secured Status of Jennifer Kay Marlow expressed in part that the redacted loan number was not included, and neither was the name of the lien holder.(see) docket entry #64.

Whether or not the Motion was deficient in structure as expressed in the same Order, Id., does not take away from the fact that the Debtor did not receive an Objection backed by an affidavit as from the alleged Creditor(s) disputing her Motion to Determine Secured Status. The Court rushed to judgment and threw out not only a Secured Claim For Which Relief Can be Granted, backed by an amended affidavit of beneficial possessory interest by Jennifer Kay Marlow, Debtor, referencing the Instrument number 2022113999, and the related UCC filing number 202109593278., but closed the case out reserving a right to enter a supplemental order later. (see) docket entry #66.

The Hearing, supra., did not go into the details of what was included in the public recordation of the Debtor's amended affidavit Id., . As such the Debtor suffered prejudice as from the Court. It is a Law Maxim, that an unrebutted affidavit stands as truth. Now, whether 'form' should supersede function is the question here.

Provided the pro se Debtor's filing was deficient in 'form', i.e. possibly related to procedure, does not negate it was not deficient in 'function'. The alleged Creditor proffered nothing into evidence that would over come the public filing at Instrument number 2022113999, by Jennifer Kay Marlow.

8

Previous recordings by the alleged Creditor(s) are merely prima facie evidence of an interest, but not direct evidence of an interest in the real property at bar, the collateral, and/or the securitization documents involved.

As regarding 'form' over function, the Court could have allowed a continuance in order for the Debtor to modify her pleading(s) to conform with the rules more efficiently. The court did not do that. The Court shut down the whole case itinerary of filings by this pro se litigant in (24) hours of her filing her Motion to Determine Secured Status.

Such is absolute evidence of a Rush-to Judgment which does not put the Court in an Equitable light, but in a Prejudicial Light which invoked Error.

There is no evidence in the record of this case that the alleged Creditor backed the U.S. Senate's report that "The ultimate ownership of all property is in the State;..." (ref) Senate Resolution 62.

Pursuant to the Senate Resolution 62, dated April 17, 1933, of the 73rd Congress, 1st Session, Document 43, known as Senate Document 43 on page thirteen has declared as follows:

"The ultimate ownership of all property is in the State; individual so-called "ownership" is only by virtue of Government, i.e. law, amounting to mere user; and use must be in accordance with law, and subordinate to the necessities of the State."

Presumably the Court did not give the "real party in interest" the silent party in interest the u.s. government a chance to file their claim into the case at bar. Therefore under Rule 60(b)(3) there is Misconduct by the opposing party. The opposing party refused to proffer into evidence who the real party in interest is, and thus for lack of joinder of parties, the alleged Creditor did not present their case properly but in fact deceived the court that it had standing to proceed with foreclosure judgment(s).

9

For all the above and demurring also to what is on the record from this pro se litigant, there are an abundance of errors in the foreclosure process as made by the plaintiff(s) which taken into full account can dismiss their action in it entirety nunc pro tunc.

Pursuant to Rule 3013 the debtor claimant herein, asks the Court to determine the classification of the creditor(s) and equity security holders before issuing what should be a Voidable or Void Order on the past Judgment(s), supra., The debtor tandemly asks that the court grant any other equitable relief applicable in favor of this Movant.

Dated: ~~October~~ _NOVEMBER_ _4_ , 2022                   'All Rights Reserved"

Exhibits attach
s/ _Jennifer Kay Marlow_
Uniform Judgment                        Jennifer Kay Marlow, movant, pro se
original complaint                      94 Tatum Rd
Puff & Stuff case                       Sarasota, FL 34240

10

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this day, _Nov 7_ 2022 a copy of the foregoing was furnished electronically, EMAIL OR FAX or via first class mail upon:

JON M WAAGE
P.O.BOX 25001
BRADENTON, FL, 34206

UNITED STATES TRUSTEE-FTM7/13
TIMBERLAKE ANNEX, SUITE 1200
501 E. POLK STREET
TAMPA, FLORIDA 33602
U.S. Trustee

US BANK TRUST                                            US BANK TRUST N.A
DIAZ ANSELMO & ASSOCIATES P.A.            100 WALL STREET       16TH FLOOR
P.O.BOX 19519                                              NEW YORK, NEW YORK 10005
FORT LAUDERDALE, FL. 33318  (954) 564-9252

TD BANK USA, N.A.
2001 WESTERN AVE. STE 400
SEATTLE, WA. 98121

ACHIEVA CREDIT UNION                           ACHIEVA CREDIT UNION
c/o o  GIBBONS NEUMAN LAW
3321 HENDERSON BLVD                              P. O. Box 1500
TAMPA, FL. 33609   (813) 877- 9290           Dunedin, Florida34697

RESURGENT CAPITAL SERVICES
P.O. BOX 1927
GREENVILLE S.C. 29602

All Rights Reserved
/s/ _Jennifer Kay Marlow_
Jennifer Kay Marlow
Jenniferlm4994@gmail.com
c/o  94 Tatum Road
Sarasota, Florida
941-209-2100

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2019148495    10 PG(S)

10/28/2019 4:30 PM
KAREN E. RUSHING
FOR CLERK'S USE ONLY
CLERK OF THE CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
CIVIL COURTS              Receipt # 2440592

IN THE CIRCUIT COURT OF THE TWELFTH
JUDICIAL CIRCUIT, IN AND FOR SARASOTA
COUNTY, FLORIDA.

CASE No. 2011 CA 001447 NC

NEWREZ LLC, F/K/A NEW PENN
FINANCIAL, LLC, D/B/A SHELLPOINT
MORTGAGE SERVICING,

Plaintiff,

VS.

MICHAEL D. HARRIS AKA MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY
TRUST; SARASOTA COASTAL CREDIT UNION; UNITED STATES OF AMERICA,
INTERNAL REVENUE SERVICE; UNKNOWN BENEFICIARY OF THE MARLOW 94
FAMILY TRUST; UNKNOWN TENANTS/OWNERS N/K/A JENNIFER MARLOW;ANY
AND ALL UNKNOWN PARTIES CLAIMING BY, THROUGH, UNDER AND AGAINST
THE NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT KNOWN TO BE DEAD OR
ALIVE, WHETHER UNKNOWN PARTIES MAY CLAIM AN INTEREST AS SPOUSES,
HEIRS, DEVISEES, GRANTEES, OR OTHER CLAIMANTS.

DEFENDANT(S).
_____/

## UNIFORM FINAL JUDGMENT OF MORTGAGE FORECLOSURE

*This form substantially complies with Form 1.996, adopted by the Florida Supreme Court*
*February 11, 2010, SC09-1579; form amended in 12th Circuit on 7/01/2019.*

THIS action was heard before the Court on Plaintiff, NewRez LLC, F/K/A New Penn

Financial, LLC, D/B/A Shellpoint Mortgage Servicing's Motion for Summary Final Judgment.

Based on the evidence presented and being otherwise fully informed in the premises,

IT IS ORDERED AND ADJUDGED that:

A
1 oF 9

1. The Plaintiff's Motion for Summary Judgment is **GRANTED** against the following Defendants:

   Michael D. Harris aka Michael Harris, Trustee of Marlow 94 Family Trust

   Sarasota Coastal Credit Union

   United States of America, Internal Revenue Service

   Unknown Beneficiary of the Marlow 94 Family Trust

   Unknown Tenants/Owners N/K/A Jennifer Marlow

| Description | Amount |
|---|---|
| Principal due on the note secured by the mortgage foreclosed: | $124,619.64 |
| Interest<br>    from September 1, 2010 to June 25, 2018 | $52,352.11 |
| Interest<br>    @ 18.35 per diem from June 26, 2018 to October 28, 2019 | $8,991.50 |
| Pre-acceleration late charges | $1,225.42 |
| Title search and Examination | $275.00 |
| Property inspection(s) | $727.25 |
| Other:  Initial Escrow Balance | $15,078.55 |
| Other:  Statutory Mail | $84.09 |
| **SUBTOTAL** | **$203,353.56** |

Attorney's Fees:

| | |
|---|---|
| *Attorney's Total Non Contested Flat Rate Fee* <br> *(The requested attorney's fee is a flat rate fee that the firm's client has agreed to pay in this matter for non-contested portion of the case. Given the amount of fee requested and the labor expended, the court finds that a lodestar analysis is not necessary for this flat fee and that a flat fee is reasonable for the non contested portion of the file.)* | $725.00 |
| Attorney's Fees based on 11.30 hours at $215.00 per hour | $2,429.50 |
| Attorney's Additional Flat Fees | $325.00 |
| **Attorney's Fees Total:** | **$3,479.50** |
| **GRAND TOTAL DUE** | **$206,833.06** |

that shall bear interest at the rate of 6.89% a year.

2. Plaintiff, whose address is c/o NewRez LLC, F/K/A New Penn Financial, LLC, D/B/A Shellpoint Mortgage Servicing, 55 Beattie Place, Ste 110, Greenville, SC 29601 holds a lien for the total sum superior to all claims of estates of Defendant(s), on the following described property in Sarasota, Florida:

> Begin at the Southeast corner of Tract 35, of PALMER FARMS 3rd UNIT, as recorded in Plat Book 3, Page 39, Public Records of Sarasota County, Florida; thence North 0 degrees 01`18" East along the West line of Tatum Road, 444.0 feet for a Point of Beginning; thence continue North 0 degrees 01`18" East, 212.35 feet; thence North 88 degrees 37` West, 200 feet; thence South 0 degrees 01`18" West, 212.35 feet; thence South 88 degrees 37` East 200 feet to the Point of Beginning.

319

3. If the total sum with interest at the rate described in paragraph 1 and all costs accrued subsequent to this judgment are not paid, the clerk of this court shall sell the property at public sale as set forth below to the highest bidder for cash, on a specified day that shall be not less than 20 days or more than 35 days after the date thereof unless plaintiff or plaintiff's attorney consents to more than 35 days after the date of final judgment, in accordance with section 45.031, Florida Statutes, using the following method:

| Check One | Sales Information | Date [Clerk Inserts] | Time | Location |
|---|---|---|---|---|
| | **Sarasota County** | *2·25·20* | 09:00:00 AM | Foreclosure sale conducted via Internet www.sarasota.realforeclose.com |
| | **Manatee County** | | 11:00:00 AM | Foreclosure sales conducted via Internet www.manatee.realforeclose.com |
| | **DeSoto County** | | 11:00:00 AM | DeSoto County Courthouse 115 Oak Street Arcadia, Florida 34266 www.desotoclerk.com |

4. Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the clerk if plaintiff is not the purchaser of the property for sale, provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title. If plaintiff is the purchaser, the clerk shall credit plaintiff's bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

5. On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of the Plaintiff's costs; second, documentary stamps affixed to the Certificate, third, Plaintiff's attorneys' fees; fourth, the total sum due to the Plaintiff, less the items paid, plus interest at the rate prescribed in Paragraph 1 from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court

4 of 9

6. On filing the Certificate of Sale, Defendant(s) and all persons claiming under or against Defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property, except as to claims or rights under Chapter 718 or Chapter 720, Florida Statutes, if any. Upon filing the Certificate of Title, the person named on the Certificate of Title shall be let into possession of the property. If any Defendant remains in possession of the property, the Clerk shall without further order of the court issue forthwith a writ of possession upon request of the person named on the Certificate of Title.

**NOTICE: Issuance of a writ of possession does not exempt plaintiff from complying with federal law requiring notice to tenants residing on foreclosed property. To insure compliance with federal law, Plaintiff should consult with counsel before serving the writ of possession.**

7. Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, a deficiency judgment.

8. **Additions. Modifications or Changes to Standard Form**

   Any additions, modifications or changes to the provisions above may only be set forth in this paragraph.

   a. **Jurisdiction of this action is retained to enter further Orders that are proper including, without limitation, a supplemental complaint to add an omitted party or lien(s) or remedy other defects post-judgment, or Order to determine the amount of the assessment owed to any condominium or homeowners association, and entry of writs of possession.**

   b. **The clerk shall further credit plaintiff's bid with any reasonable advances made by the Plaintiff subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.**

5 8 9

c.  If the United States of America is a defendant, it shall have the right of redemption pursuant to 28 U.S.C. Section 2410 (c), from the date of the foreclosure sale.

d.  The Court finds that Plaintiff complied with the condition precedent of providing notice prior to acceleration of the loan, and prior to the filing of the foreclosure action, pursuant to the terms of the Note and Mortgage.

e.  On or before the date of sale, Plaintiff may assign the judgment and/or the bid by filing an Assignment of Judgment and/or Bid without further order of this Court.

f.  On or before the date of sale, Plaintiff may file an Affidavit of Additional Costs and Interest without further order of this Court.

g.  The subject Mortgage is hereby reformed nunc pro tunc to the date of the original recording. The Mortgage was recorded on November 21, 2002, in Official Records Book/Instrument 2002194105, of the Public Records of Sarasota County, Florida.  The correct legal description of the property is: Begin at the Southeast corner of Tract 35, of PALMER FARMS 3rd UNIT, as recorded in Plat Book 3, Page 39, Public Records of Sarasota County, Florida; thence North 0 degrees 01`18" East along the West line of Tatum Road, 444.0 feet for a Point of Beginning; thence continue North 0 degrees 01`18" East, 212.35 feet; thence North 88 degrees 37` West, 200 feet; thence South 0 degrees 01`18" West, 212.35 feet; thence South 88 degrees 37` East 200 feet to the Point of Beginning.

h.  The Deed is hereby reformed nunc pro tunc to the date of the original recording. The Deed was recorded on June 26, 2006 in Official Records Book/Instrument 2006116758, . of the Public Records of Sarasota County, Florida.  The correct legal description of the property is Begin at the Southeast corner of Tract 35, of PALMER FARMS 3rd UNIT, as recorded in Plat Book 3, Page 39, Public

6 oF 9

Records of Sarasota County, Florida; thence North 0 degrees 01`18" East along the West line of Tatum Road, 444.0 feet for a Point of Beginning; thence continue North 0 degrees 01`18" East, 212.35 feet; thence North 88 degrees 37` West, 200 feet; thence South 0 degrees 01`18" West, 212.35 feet; thence South 88 degrees 37` East 200 feet to the Point of Beginning.

i.   The Plaintiff's Motion for Summary Judgment is GRANTED and Final Judgment is ENTERED.

NOTICE PURSUANT TO § 45.031, FLORIDA STATUTES (2018).

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, IF ANY, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN THE DATE THAT THE CLERK REPORTS THE FUNDS AS UNCLAIMED.  IF YOU FAIL TO FILE A TIMELY CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

If the property being foreclosed on has qualified for the homestead tax exemption in the most recent approved tax roll, the following additional language applies:

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF.  YOU ARE NOT REQUIRED OT HAVE A LAWYER OR ANY OTHER REPRSENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED.  PLEASE CHECK WITH THE CLERK OF THE COURT FOR YOUR COUNTY WITHIN TEN (10) DAYS

AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

| Sarasota County Clerk of Court | Manatee County Clerk of Court | DeSoto County Clerk of Court |
|---|---|---|
| 2000 Main Street Sarasota, Florida 34237 (941) 861-7400 www.sarasotaclerk.com | 1115 Manatee Ave W Bradenton, FL 34205 (941) 749-1800 www.manateeclerk.com | 115 East Oak Street Arcadia, FL 34266 (863) 993-4876 www.desotoclerk.com |

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION. IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT THE LOCAL LEGAL SERVICES LISTED BELOW TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST OTHER OPTIONS. IF YOU CHOOSE TO CONTACT ONE OF THE SERVICES LISTED BELOW, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER THE RECEIPT OF THIS NOTICE.

8 of 9

| Sarasota County | Manatee County | DeSoto County |
|---|---|---|
| **Legal Aid of Manasota**<br>**Sarasota Office**<br>1900 Main Street, Suite 302<br>Sarasota, Florida 34236<br>(941) 366-0038<br>**Venice Office**<br>7810 South Tamiami Trail<br>Suite A6<br>Venice, Florida 34293<br>(941) 492-4631<br><br>**Gulfcoast Legal Services**<br>1750 17th Street, Bldg. 1<br>Sarasota, Florida 34236<br>(941) 366-1746<br>www.gulfcoastlegal.org | **Legal Aid of Manasota**<br>1101 6th Avenue West<br>Bradenton, Florida 34205<br>(941) 747-1628<br>www.gulfcoastlegal.org<br><br>**Gulfcoast Legal Services**<br>430 12th Street West<br>Bradenton, Florida 34205<br>(941) 746-6151<br>www.gulfcoastlegal.org | Fla. Rural Legal Services<br>3210 Cleveland Avenue, Suite A<br>Ft. Myers, Florida 33901<br>(800) 476-8937<br>www.flrs.org |

**DONE AND ORDERED** in Chambers in SARASOTA COUNTY, Florida, this 2nd day of October, 2019.

_____
CIRCUIT JUDGE

*Copies furnished to all parties on attached Service List*

9 of 9

IN THE CIRCUIT CIVIL COURT OF THE TWELFTH JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR SARASOTA COUNTY
CIVIL DIVISION

GMAC MORTGAGE, LLC

      Plaintiff,

vs.

MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW
94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW
94 FAMILY TRUST, SARASOTA COASTAL CREDIT UNION, UNITED
STATES OF AMERICA, INTERNAL REVENUE SERVICE, AND
UNKNOWN TENANTS/OWNERS,

      Defendants.
_____/

Case No.

Division

### VERIFIED MORTGAGE FORECLOSURE COMPLAINT

    Plaintiff, GMAC MORTGAGE, LLC, by and through its undersigned attorneys, sues Defendants, MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW 94 FAMILY TRUST, SARASOTA COASTAL CREDIT UNION,, UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE, and UNKNOWN TENANTS/OWNERS, and states:

### GENERAL ALLEGATIONS

    1.    As of the date of the execution of this complaint, GMAC MORTGAGE, LLC, is the holder of the Note and Mortgage which are the subject of this suit.

    2.    Defendant(s), MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW 94 FAMILY TRUST, is/are the record owner(s) of the property sought to be foreclosed by the Plaintiff, and hold title to the property subject to the Mortgage described herein.

    3.    Defendants, SARASOTA COASTAL CREDIT UNION,, UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE, and UNKNOWN TENANTS/OWNERS, are persons and/or entities who have or may claim some right, title, interest, or lien in, to, or upon the Property described below.

    4.    On November 4, 2002, RALPH V. MARLOW, executed and delivered a Note, and a Mortgage securing the Note in favor of SENTINEL MORTGAGE COMPANY.  The Mortgage was signed and executed by RALPH V. MARLOW and JENNIFER K. MARLOW, husband and wife and was recorded on November 21, 2002 as instrument number 2002194105 and was assigned to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for GMAC BANK, ISAOA, ATIMA recorded on 11/21/2002 in Instrument 2002194106, of the Public Records of Sarasota County, Florida.  A copy of the Mortgage and Promissory Note is attached hereto.  Said Note and Mortgage were subsequently assigned and/or endorsed in favor of the Plaintiff.

    5.    Mortgagee shown on the Mortgage attached as an exhibit is the original Mortgagee. Plaintiff is now entitled to enforce Mortgage and Mortgage Note pursuant to Florida Statutes 673.3011.

    6.    A default exists under the Note and Mortgage as a result of a lack of payment of the installment due October 1, 2010, and all subsequent payments on the Note.

    7.    Plaintiff has, if required by the Note or Mortgage, demanded payment of the obligation reflected by the aforesaid Note and Mortgage, but despite such demand, said default has not been cured.

B
1 of 23

8.    Plaintiff hereby accelerates all principal and interest under the Note and Mortgage to be immediately due and payable.

9.    Plaintiff is due the sum of ONE HUNDRED TWENTY-FOUR THOUSAND SIX HUNDRED NINETEEN AND 64/100 Dollars ($124,619.64) in principal under the Note and Mortgage, plus interest from September 1, 2010, title search expenses for ascertaining necessary parties to this action, unpaid taxes, insurance premiums, accumulated late charges, and inspection fees.

10.    As a result of the default under the Note and Mortgage, it has become necessary for the Plaintiff to employ the undersigned attorneys to prosecute this action, and Plaintiff has agreed to pay such attorneys a reasonable fee for their services. Under the terms and provisions of the Note and Mortgage, Plaintiff is entitled to recover its reasonable attorney's fees in bringing this action. Plaintiff alleges that a reasonable attorney's fee in this matter would be $1,200.00 and will seek an award of such amount in the event that a default judgment is entered against the Defendant. In the event that this matter is contested, Plaintiff intends to seek additional attorney's fees based upon the hours spent, services rendered and other reasonable factors.

11.    Defendant(s), MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW 94 FAMILY TRUST, and/or UNKNOWN TENANTS/OWNERS, now own, possess, or have the right to possess the Property.

12.    Defendant(s), SARASOTA COASTAL CREDIT UNION, may claim some interest in the subject property by virtue of judgment, lien, or other instrument recorded on 05/24/2002 as instrument number 2002084250, of the Public Records of Sarasota County, Florida. Said interest should be removed from the chain of title on the subject property because upon information and belief, such mortgage has been paid in full, but not released or satisfied of record, and thus is subordinate and inferior to a lien of Plaintiff's mortgage.

13.    Defendant(s), UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE, may claim some interest in the subject property by virtue of Notice of Federal Tax Lien, RALPH V MARLOW, whose residence was 94 TATUM RD, SARASOTA, FL 34240-9105, and said lien was recorded in the public records of SARASOTA County, Florida on 04/26/2010, in Official Records Book , Page , which notice was prepared by BALTIMORE, MD.

14.    Defendant(s), UNKNOWN TENANTS/OWNERS, may claim some interest in the subject property by virtue of their possession of the property.

## COUNT I
## MORTGAGE FORECLOSURE

15.    Plaintiff realleges and incorporates Paragraphs 1 through 14 of this Complaint.

16.    This is an action to foreclose the first Mortgage on real property (the "Property") in Sarasota County, Florida, having a legal description as follows:

BEGIN AT THE SOUTHEAST CORNER OF TRACT 35, OF PALMER FARMS 3rd UNIT , AS RECORDED IN PLAT BOOK 3, PAGE 39, PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA; THENCE NORTH 0° 01' 18" EAST ALONG THE WEST LINE OF TATUM ROAD, 444.0 FEET FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 0° 01' 18" EAST,

212.35 FEET; THENCE NORTH 88°37' WEST, 200 FEET; THENCE SOUTH 0°01' 18" WEST,
212.35 FEET; THENCE SOUTH 88°37' EAST 200 FEET TO THE POINT OF BEGINNING.

with a street address of 94 TATUM ROAD, SARASOTA, FL 34240, herein referred to as "the Property."

17.    Under the terms of the Mortgage and in accordance with Florida law, Plaintiff is entitled to foreclosure of its Mortgage upon default in payment.

18.    All conditions precedent to the enforcement of Plaintiff's right to foreclosure herein and the maintenance of this action have been performed, have occurred, or have been waived.

WHEREFORE, Plaintiff requests that this honorable Court:

(a)    Take jurisdiction of the parties hereto and of the subject matter hereof;

(b)    Order that the lien of Plaintiff's Mortgage is a valid first lien on the Property described and is superior to any lien of record ;

(c)    Order foreclosure of the Mortgage, and that all Defendants named herein, their estates, and all persons claiming under or against them since the filing of the Notice of Lis Pendens, be foreclosed;

(d)    Determine the amount due Plaintiff under the Note and Mortgage sued upon herein;

(e)    Order that if said sum due Plaintiff is not paid in full within the time set by this Court, the Property be sold by Order of this Court to satisfy Plaintiff's claims;

(f)    Order that if the proceeds from such court ordered sale are insufficient to pay Plaintiff's claim, then a deficiency judgment be entered for the remaining sum against all Defendants who have assumed personal liability for same and who have not received a discharge in bankruptcy;

(g)    Order delivery and possession of the real property to the Purchaser, who shall be responsible for condominium or homeowner association assessments and other charges in accordance with §§718.116 and 720.3085, Florida Statutes (2007), respectively.and upon proof of the demand or refusal of any Defendant to vacate and surrender such possession, and the clerk be directed to issue a writ of possession without further order of this Court;

(h)    Retain jurisdiction of this cause and the parties hereto to determine Plaintiff's entitlement to a deficiency judgment and the amount thereof; and

(i)    Grant such other and further relief as appears just and equitable under the circumstances.

**COUNT II**
**REFORMATION OF QUIT CLAIM DEED**

19.    This is an action to reform the Quit Claim Deed held by Plaintiff.

20.    Paragraphs 1, 2, 4 and 5 are hereby incorporated and made a part of this Count.

21.    The Quit Claim Deed, prepared by Plaintiff's predecessor, contains a scrivener's error in the legal description. The parties intended that Plaintiff's predecessor have a valid Quit Claim Deed on the subject property.

BEGIN AT THE SOUTHEAST CORNER OF TRACT 35, OF PALMER FARMS 3rd UNIT , AS RECORDED IN PLAT BOOK 3, PAGE 39, PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA; THENCE NORTH 0° 01' 18" EAST ALONG THE WEST

LINE OF TATUM ROAD, 444.0 FEET FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 0° 01' 18" EAST, 212.35 FEET; THENCE NORTH 88°37' WEST, 200 FEET; THENCE SOUTH 0°01' 18" WEST, 212.35 FEET; THENCE SOUTH 88°37' EAST 200 FEET TO THE POINT OF BEGINNING.

22.     Plaintiff and Defendant are the only parties having an interest in the reformation of the Quit Claim Deed.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiff reforming the Quit Claim Deed to correct the scrivener's error in the legal description.

<div align="center">

**COUNT III**
**QUIET TITLE**

</div>

23.     This is an action to quiet title on real property.

24.     Paragraphs 1 through 10 and 12 are hereby incorporated and made a part of this Count III.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiff removing the Mortgage found in instrument number 2002194105 of the Public Records of Sarasota County, Florida, from the chain of title on the subject property.

<div align="center">

**NOTICE UNDER FAIR DEBT COLLECTION PRACTICES ACT**

</div>

Pursuant to Title 15 United States Code Section 1692g(d), a communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a) of this section.

DATED: _2/15/11_.

        ☐ Erin M. Berger/Florida Bar #014977
        ☐ Elizabeth M. Ferrell/Florida Bar #052092
        ☐ Adam J. Hardman/Florida Bar #037533
        ☐ Clay A. Holtsinger/Florida Bar #294330
        ☐ Frances E. Johnson/Florida Bar #543055
        ☐ Christopher C. Lindhardt/Florida Bar #0028046
        ☐ Zachary A. Liszt/Florida Bar #041367
        ☐ Ian MacAlister/Florida Bar #086105
        ☐ Nicole M. Mariani/Florida Bar #069883
        ☐ Richard S. McIver/Florida Bar #559120
        ☐ Laura E. Noyes/Florida Bar #065454
        ☐ Edward B. Pritchard/Florida Bar #712876
        ☐ Melissa R. Rinaldi/Florida Bar #050252
        ☐ Mitchell B. Rothman/Florida Bar #870560
        ☐ Grace S. Santos/Florida Bar #029518
        ☐ Ashley L. Simon/Florida Bar #064472
        ☐ Joan Wadler/Florida Bar #894737
Kass, Shuler, Solomon, Spector,
Foyle & Singer, P.A., Attorneys for Plaintiff
P.O. Box 800, 1505 N. Florida Ave.
Tampa, FL 33601
(813) 229-0900

327610/1100518/jsm

IN THE CIRCUIT CIVIL COURT OF THE TWELFTH JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR SARASOTA COUNTY
CIVIL DIVISION

GMAC MORTGAGE, LLC

    Plaintiff,

vs.

Case No.

Division

MICHAEL D. HARRIS aka MICHAEL HARRIS,
TRUSTEE OF MARLOW 94 FAMILY TRUST and
UNKNOWN BENEFICIARY OF THE MARLOW 94
FAMILY TRUST, et. al.

    Defendants.

_____/

## VERIFICATION OF FORECLOSURE COMPLAINT

    Under penalty of perjury, I declare that I have read the foregoing Mortgage Foreclosure Complaint, and the facts alleged therein are true and correct to the best of my knowledge and belief.

GMAC MORTGAGE, LLC   Perry Coleman

By: _____

As the: _____Authorized Officer_____

For: GMAC MORTGAGE, LLC

Date: __2/10/2011__

327610/1100518/jsm

FEB 1 4 2011

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002194105 13 PGS
2002 NOV 21 01:42 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
DMANNING  Receipt#245057

Doc Stamp-Mort:    756.00
Intang. Tax:       432.00

After Recording Return To:
Sylvia J. Taylor, P.A.
1819 Main Street, Suite 400A
Sarasota, FL 34236
Prepared by:
Sentinel Mortgage Company
1819 Main Street, Suite 301
Sarasota, FL 34236
(941) 365-5626

Loan No.



# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated   November 4, 2002
together with all Riders to this document.

(B) **"Borrower"** is
Ralph V. Marlow and Jennifer K. Marlow, husband and wife

Borrower is the mortgagor under this Security Instrument.

(C) **"Lender"** is  Sentinel Mortgage Company

Lender is a
organized and existing under the laws of  Florida
Lender's address is  1819 Main Street, Suite 301.
                     Sarasota, FL  34236
Lender is the mortgagee under this Security Instrument.

(D) **"Note"** means the promissory note signed by Borrower and dated  November 4, 2002
The Note states that Borrower owes Lender   Two Hundred Sixteen Thousand DOLLARS and Zero CENTS

Dollars (U.S. $ 216,000.00          ) plus interest.  Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than   November 1, 2017

(E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(F) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010 - 181   (A)                 Page 1 of 13      Initials

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower  The following Riders are to be executed by Borrower (check box as applicable):

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ Biweekly Payment Rider ☐ V.A. Rider
☐ Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (a) principal and interest under the Note, plus (b) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01                              Page 2 of 13    Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

County                                of                        Sarasota
[Type of Recording Jurisdiction]                                 [Name of Recording Jurisdiction]

Begins at the Southeast corner of Tract 35, Palmer Ranch, Third Unit, according to the plat thereof recorded in Plat Book 3, Page 39, of the Public Records of SARASOTA County, Florida; thence North 00 degrees 1 minute 18 seconds East, along the West line of Tatum Road, a distance of 444.0 feet for a Point of Beginning; thence continue North 00 degrees 1 minute 18 seconds East, a distance of 212.35 feet; thence North 88 degrees 37 minutes West, a distance of 200 feet; thence South 00 degrees 1 minute 18 seconds West, a distance of 212.35 feet; thence South 88 degrees 37 minutes East, a distance of 200 feet to the Point of Beginning.

which currently has the address of                        94 Tatum Road
                                                                                 [Street]

        Sarasota                        , Florida        34240        ("Property Address"):
         [City]                                                         [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

   BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01                Page 3 of 13        Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to

provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy.  Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   Preservation, Maintenance and Protection of the Property; Inspections.  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01

Page 6 of 13          Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

Section 5 that repair or restoration is not economically feasible. Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent give materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture.  All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01                        Page 8 of 13          Initials: _____

Page 8 of 13

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  Loan Charges.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3626
LFI #FNMA3010  1/01                         Page 9 of 13              Initials: _____  _____

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms,

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 Pgs

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
Diana L. Crum                              Ralph V. Marlow                 -Borrower

_____          _____ (Seal)
Sylvia J. Taylor                           Jennifer K. Marlow              -Borrower

                                          _____ (Seal)
                                                                          -Borrower

                                          _____ (Seal)
                                                                          -Borrower

——————————— [Space Below This Line For Acknowledgment] ———————————

**STATE OF FLORIDA,**                                               County ss:

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared
Ralph V. Marlow and Jennifer K. Marlow, husband and wife

known to me to be the person(s) described in and who executed the foregoing instrument or who (has) (have) produced _____ as identification and did (did not) take an oath and acknowledged before me that he/she/they executed the same for the purpose therein expressed.

WITNESS my hand and official seal in the county and state aforesaid this   4th   day of November, 2002

My Commission expires:          _____
                                                         - Notary Public

OFFICIAL NO...
SYLVIA TAYLOR                  (Seal)
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC84...
MY COMMISSION EXP...

**FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01                              Page 13 of 13

Instruments provided by DataTree. 1.5 of its proprietary imaging and index system. Copyright 2003. All rights reserved.

```
RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002194106 2 PGS
      2002 NOV 21 01:42 PM
        KAREN E. RUSHING
     CLERK OF CIRCUIT COURT
    SARASOTA COUNTY,FLORIDA
      DMANNING  Receipt#245057
```

Return to Sylvia J. Taylor, P.A.
1819 Main Street, Suite 400A
Sarasota, FL 34236

——————————————— [Space Above This Line For Recording Data] ———————————————

Parcel Tax ID #.:  0217-16-0027
This form was prepared by:  Sentinel Mortgage Company
address:  1819 Main Street, Suite 301
          Sarasota, FL 34236
tel. no:  (941) 365-5526

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is
1819 Main Street, Suite 301, Sarasota, FL 34236
does hereby grant, sell, assign, transfer and convey, unto the
Mortgage Electronic Registration Systems, Inc., ISAOA, as nominee for GMAC Bank, ISAOA, ATIMA
a corporation organized and existing under the laws of                          (herein "Assignee"),
whose address is  100 Witmer Road, Horsham, PA 19044
a certain Mortgage dated  November 4, 2002                , made and executed by
Ralph V. Marlow and Jennifer K. Marlow, husband and wife

to and in favor of  Sentinel Mortgage Company
                                              upon the following described property situated in
                          Sarasota  County, State of  Florida            :
Begins at the Southeast corner of Tract 35, Palmer Ranch, Third Unit, according to the plat thereof
recorded in Plat Book 3, Page 38, of the Public Records of SARASOTA County, Florida; thence North 00
degrees 1 minute 18 seconds East, along the West line of Tatum Road, a distance of 444.0 feet for a
Point of Beginning; thence continue North 00 degrees 1 minute 18 seconds East, a distance of 212.35
feet; thence North 88 degrees 37 minutes West, a distance of 200 feet; thence South 00 degrees 1
minute 18 seconds West, a distance of 212.35 feet; thence South 88 degrees 37 minutes East, a
distance of 200 feet to the Point of Beginning.


MIN Number: 100037506004619541

MERS Phone No.: 1-888-679-MERS


such Mortgage having been given to secure payment of  216,000.00
                                                       (include the Original Principal Amount)


Laser Forms Inc. (800) 446-3565
LF1ML15IMP 11/98                    Page 1 of 2        Initials

OFFICIAL RECORDS INSTRUMENT # 2002194106 2 PGS

which Mortgage is of record in Book, Volume, or Liber No. *Inst #2002194105*, at page
(or as No.            ) of the            Records of **Sarasota**
County, **Florida**            , together with the note(s) and obligations therein described and
the money due and to become due thereon with interest, and all rights accrued or to accrue under such
Mortgage.

   TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the
terms and conditions of the above-described Mortgage.

   IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on
**November 4, 2002**

|  |  |
|---|---|
| Witness (Print Name) | **Sentinel Mortgage Company** |
| **Brenda L Whitehurst** | (Assignor) |
| Diardre Krone | By _____ |
| Witness (Print Name) | (Signature) |
| **Dierdre Krone** | (Print Name & Title) |
| Attest (Print Name) | **Linda G. Wilf** |
|  | **Executive Vice President** |

Seal:

———————— (Space Below This Line Reserved For Acknowledgment) ————————

**STATE OF Florida**
**COUNTY OF Sarasota**

On   **November 4, 2002**            before me, the undersigned, a Notary Public in and for
said County and State, personally appeared   **Linda G. Wilf**
known to me to be the   **Executive Vice President**
and                                          , known to me to be
                                             of the corporation herein which
executed the within instrument, that the seal affixed to said instrument is the corporate seal of said
corporation, that said instrument was signed and sealed on behalf of said corporation pursuant to it's by-laws
or a resolution of it's Board of Directors and that he/she acknowledges said instrument to be the free act and
deed of said corporation.

KATHERYN J. SOKOL
MY COMMISSION # DD 130111
EXPIRES: September 15, 2008
Bonded Thru Notary Public Underwriters

Katheryn J. Sokol
Notary Public
My Commission Expires   09/15/2008

**(THIS AREA FOR OFFICIAL**
**NOTARIAL SEAL)**                    **Sarasota**            County.
                                     **Florida**

Laser Forms Inc. (800) 446-3555
LFI #LFI8MP 11/03        **Page 2 of 2**

# NOTE
### (FLORIDA FIXED RATE)

Loan ████████████

November 4, 2002                    Sarasota                          Florida
[Date]                               [City]                           [State]

94 Tatum Road
Sarasota, FL  34240
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 218,500.00          (this amount is called
"Principal"), plus interest, to the order of the Lender. The Lender is
Sentinel Mortgage Company

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and
who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at
a yearly rate of        6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1st    day of each month beginning on   December 1, 2002
I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date
and will be applied to interest before Principal. If, on  November 1, 2017               , I still owe amounts under
this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  1819 Main Street, Suite 301
Sarasota, FL 34236
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,750.01

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is
known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I
may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may
apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date
or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then:  (a)

FLORIDA FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Form 3210 1/01
Laser Forms Inc. (800) 446-3225

██████████                    Page 1 of 3        Initials 

any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**FLORIDA FIXED RATE NOTE** - Single Family - **FNMA/FHLMC** Uniform Instrument
Form 3210 1/01

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Ralph V. Marlow        -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

Pay to the Order of
GMAC Mortgage Corporation
Without Recourse

Joanne Wight, Vice President
Acting Agent for GMAC Bank

Pay to the order of GMAC Bank, ISAOA without recourse
this 4th day of November, 2002

_____
Sentinel Mortgage Company
Linda G. Wilf, Executive Vice President

PAY TO THE ORDER OF

WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

_____
J. Vollmer
Limited Signing Officer

FLORIDA FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Form 3210 1/01
Laser Forms Inc. (800) 446-3555                    Page 3 of 3

**945 F.Supp. 1523**
**PUFF 'N STUFF OF WINTER PARK, INC.,**
**Glenn F. Dietel, Christine B. Dietel,**
**Barbara E. O'Brien and Warren Dietel,**
**Plaintiffs,**

**v.**

**FEDERAL TRUST BANK, F.S.B., Federal**
**Trust Corporation, James T. Bell and**
**Daniel W. Lykens, Defendants.**
**No. 95-637-CIV-ORL-18.**
**United States District Court, M.D. Florida,**
**Orlando Division.**
**November 8, 1996.**

Page 1524

COPYRIGHT MATERIAL OMITTED

Page 1525

David L. Fleming, Law Office of David L. Fleming, Gulf Breeze, FL, for plaintiffs.

Eli H. Subin, Subin, Rosenbluth, Losey, Brennan, Bittman & Morse, P.A., Orlando, FL, for defendants.

Karen Bruton, Office of Thrift Supervision, Regional Counsel, Atlanta, GA, for movant.

**ORDER**

G. KENDALL SHARP, District Judge.

Plaintiffs bring this action against the defendants claiming violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, codified at 18 U.S.C. §§ 1961-1965, based upon an alleged pattern of bank and mail fraud in connection with a series of commercial loans. In 1994, the loans became the subject of foreclosure actions filed against the instant plaintiffs in state court. In the same year, plaintiffs sought the protection of the United States Bankruptcy Court. Plaintiffs filed the instant action on June 22, 1995. The case is presently before the court on defendants' motion for summary judgment, to which plaintiffs have responded in opposition. Defendants contend,

*inter alia*, that they are entitled to judgment as a matter of law in the instant case on procedural grounds. Having now reviewed the case file and relevant law, the court concludes that defendants' motion should be granted.

**I. Findings of Fact**

Plaintiff Puff 'N Stuff of Winter Park, Inc. (PNS) is a Florida corporation with its principal place of business in Winter Park, Florida. PNS operates a catering and banquet business. Plaintiffs Glenn and Christine Dietel (the Dietels) are husband and wife and are the sole shareholders and directors of PNS. Plaintiff Warren Dietel is the Dietels' son, while plaintiff Barbara E. O'Brien (O'Brien) is Christine Dietel's mother.

Defendant Federal Trust Bank, F.S.B. (Federal Trust) is a federal savings bank organized under the laws of the United States and supervised by the federal Office of Thrift Supervision. Defendant James T. Bell (Bell) founded Federal Trust and served as its chief executive officer at all times relevant to this litigation. Defendant Daniel W. Lykens (Lykens) was at all relevant times the vice president of Federal Trust and was personally involved with the plaintiffs on behalf of Federal Trust.

Page 1526

The incidents that eventually spawned this lawsuit began in mid-1990 when the Dietels sought financing to fund an expansion of their catering business. The Dietels planned to purchase certain property on Forsyth Road in Winter Park, Florida and construct a banquet hall on the site.

In July of 1990, a PNS representative met Bell while soliciting the catering contract for Federal Trust's grand opening. When Bell discovered that PNS had expansion plans, he sought to have Federal Trust provide the financing PNS needed. At that time, PNS had already been approved for a loan through another lender. After being apprised of the Dietel's

financing needs,[1] Bell apparently represented that he "was the bank" for all practical purposes and that the Dietels would have no difficulty in obtaining their needed financing. Even though Bell informed the Dietels of Federal Trust's lending limit of $600,000 per borrower, he explained that several upcoming events would put Federal Trust in a position to increase the loan limit per borrower and allow it to fully fund the PNS expansion. In short, Bell answered the Dietels' several concerns by assuring them that, regardless of the contingency, Federal Trust would always be able to "work something out" to satisfy their borrowing needs.

The Dietels claim that Bell was fully aware of their personal financial condition and that of PNS. They also claim that Bell knew that the timing of the loan disbursements by Federal Trust would be crucial to the expansion project's success, and their ability to meet business commitments to be made in reliance on the loan and the expectation of their new facility being completed on time.

After the Dietels agreed to allow Federal Trust to handle their financing needs, Bell introduced them to Lykens who handled the acquisition loan for the Forsyth Road property. The loan and purchase of the property closed on October 20, 1990. The Dietels claim that Lykens reviewed plans for the remodeling and either approved them or made suggested alterations on behalf of Federal Trust. Lykens also helped the Dietels select the contractor for the expansion and renovations.

The Dietels secured their building permit on July 30, 1991, and construction began. The Dietels claim that both Bell and Lykens fully committed, on behalf of Federal Trust, to providing the funding necessary to complete the construction project and never indicated any reservations about Federal Trust's ability to do so. Federal Trust paid the first draw request from the Dietel's contractor in the amount of $55,753.83. When the second request came in the amount of $39,106.35, Lykens allegedly instructed Federal Trust employees to inform the Dietels and PNS

that it was unable to pay the draw because the payment would cause Federal Trust to exceed its per-borrower lending limit.

Because Federal Trust refused to pay the second draw request, the construction company halted its work on the expansion project. The stoppage allowed the unfinished portion of the job to be exposed to the elements and caused the overall project to be delayed. The delay in turn prevented PNS from fulfilling business commitments it made in anticipation of the project's timely completion. The Dietels claim this damaged PNS's business reputation in the community.

To remedy this situation, in September of 1991, Bell and Lykens suggested an additional loan be made for the benefit of PNS but in the name of John and Barbara O'Brien, Christine Dietel's parents. This was admittedly to circumvent Federal Trust's lending limit per borrower. The Dietels originally resisted this solution as they did not want to involve Christine's aging parents. But in October of 1991, at the insistence of Bell and Lykens, the Dietels grudgingly agreed to pledge all their remaining assets as collateral to secure a nonrecourse loan in the O'Briens' name. The O'Briens were also made to post collateral before Federal Trust would agree to close the loan.

Finding that the loan in the O'Briens' name was still not enough to complete the

Page 1527

job, Federal Trust made another loan to the O'Briens, allegedly over the Dietels objection, in the amount of $110,000 for which the O'Briens pledged their home as collateral. Another loan was then made to the Dietels son, Warren, again allegedly over the Dietels' objection. Even after the additional loans to the O'Briens and Warren Dietel for the benefit of PNS, the project nonetheless lacked adequate funding because of cost overruns and delays allegedly caused by Federal Trust's failure to fund the original loan as agreed.

fast

2 of 8

In early 1992, a portion of the money advanced to the Dietels and PNS was repaid by way of a $700,000 loan from another bank, Bay Bank. Lykens allegedly engineered this loan and induced the Dietels to comply by promising a $45,000 credit line for operating expenses and by promising to release the property pledged by the O'Briens as collateral, including their home. The Dietels entered this loan arrangement, from which $643,000 was paid to Federal Trust to pay down prior advances. Notwithstanding its representations however, Federal Trust allegedly refused to extend the promised line of credit and refused to release the mortgage on the O'Briens' home. In making such allegations, the plaintiffs claim that Federal Trust acted in a malicious manner throughout the latter stages of their relationship. This malice, the Dietels contend, damaged their personal and business reputation and that of PNS.

The Dietels contend that the abovementioned acts of Federal Trust, through Bell and Lykens, constitute bank fraud. They further contend that Federal Trust and the individual defendants utilized the United States mails in the purposeful furtherance of their bank fraud. Thus, plaintiffs contend that the latter constitutes mail fraud which, together with their allegations of bank fraud, support their instant claim under the RICO statute.

In 1994, Federal Trust filed foreclosure actions in Florida state court against each of the plaintiffs in the instant case. In the foreclosure actions, the Dietels and PNS filed counterclaims against Federal Trust and the other defendants presently at bar, alleging a variety of business-related torts but not a civil RICO action. Although Federal Trust filed a foreclosure action against O'Brien and Warren Dietel, neither responded with counterclaims. The abovestated facts are undisputed as they relate to the court's review of Federal Trust's motion.

## II. Legal Discussion

Plaintiffs bring the instant action pursuant to the federal RICO statute, codified at 18 U.S.C. §§ 1961-65, alleging a pattern of bank and mail fraud as the requisite predicate acts. Defendants have filed a motion for summary judgment based upon several legal arguments, to which plaintiffs have responded in opposition. After setting forth the standard by which motions for summary judgment are reviewed, the court will address the issues which convince the court that defendants' motion should be granted.

### A. Legal Standard for Summary Judgment

Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Material facts are those that may affect the outcome of the case under the applicable substantive law. Disputed issues of material fact preclude the entry of summary judgment; but factual disputes that are irrelevant or unnecessary will not be counted. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of proving that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. Anderson, 477 U.S. at 255, 106 S.Ct. at 2513-14; see Matsushita Elec. Indus. v. Zenith

Page 1528

Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356-57, 89 L.Ed.2d 538 (1986). The moving party may rely solely on its pleadings to satisfy this burden. Celotex, 477 U.S. at 323-24, 106 S.Ct. at 2552-53; Fed.R.Civ.P. 56(c). However, the non-moving party that bears the

fast

burden of proof at trial must go beyond the pleadings and submit affidavits, depositions, answers to interrogatories, or admissions that designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The district court's function at the summary judgment stage is not to weigh the quality of the evidence submitted in support of and in opposition to the motion for summary judgment. Rather, the court is charged only with the duty of determining whether the record, when evaluated against the background of Rule 56, presents a material factual dispute requiring a trial for resolution. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513-14.

### B. The Merits of Defendants' Motion

The defendants' memorandum in support of their motion for summary judgment sets forth four legal arguments in support of their position. One argument is that the plaintiffs' instant claim is barred in this court because it is predicated upon the same operative facts as the state foreclosure actions pursued in 1994. As such, Federal Trust and the other defendants at bar contend that the civil RICO action presently before the court should have been pressed in state court as a compulsory counterclaim and, therefore, is now barred by the doctrine of *res judicata* and Florida's compulsory counterclaim rule. Plaintiffs retort claiming that their RICO claim would have been nothing more than a permissive counterclaim in state court and is, therefore, not presently barred. The court must disagree.

### 1. The Foreclosure Action Against PNS and the Dietels

In Federal Trust's state foreclosure action, PNS and the Dietels advanced a counterclaim for various business-related torts, but not civil RICO. In their four-count counterclaim, PNS and the Dietels set forth claims for fraud, breach of fiduciary duty, negligent misrepresentation, and promissory estoppel. The factual allegations made to support the state counterclaim, filed in the state court on May 11, 1994, match those in the

instant case almost verbatim. The only difference between the allegations in the state court counterclaim and the claim presently at bar is the absence in the state court of the allegations relating to mail fraud. However, of the 23 mailings plaintiffs list in their complaint to support mail fraud as a predicate act, all but one bear dates between 1990 and 1992, two years before the foreclosure action was filed.[2]

While plaintiffs ground their RICO claim upon bank fraud as well as mail fraud, the allegations that support their theory of bank fraud as a predicate act are no different than the allegations plaintiffs relied upon in their state court counterclaim as grounds for the four claims they stated, save the fact that plaintiffs' counterclaim was for common law fraud as opposed to bank fraud.[3] On December 14, 1994, the state trial judge who presided over Federal Trust's foreclosure action issued a final judgment in favor of Federal Trust, Bell, and Lykens, among others, on the counterclaim filed by PNS and the Dietels.

Page 1529

"When a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter that might have been offered for that purpose.'" *Sunnen,* 333 U.S. at 597, 68 S.Ct. at 719 (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)); *see also Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980). Final state court judgments are accorded the same preclusive effect in federal court as they are due in the courts of the state in which the judgment was rendered. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984).

Thus, in determining the preclusive effect of the final judgment against PNS and the Dietels, the court must apply Florida's law on this issue. There are four prerequisites which must be

fast

4 of 8

satisfied before preclusive effect can attach to a final judgment under Florida law: "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality in the person for or against whom the complaint is made." *Adams v. Sewell*, 946 F.2d 757, 762 (11th Cir.1991), *overruled on other grounds by McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994).

As to the first element, the court finds that PNS and the Dietels seek the same relief at bar as was sought in their counterclaim in state court. Specifically, as to each count in the counterclaim, PNS and the Dietels sought "damages, prejudgment interest, post-judgment interest, costs, attorney's fees and such other relief as the Court may deem just and proper." In the instant case, plaintiffs "demand judgment against the defendants for three times their damages and for their costs, including attorney's fees, and further pray for such other and further relief, including injunctive relief and cancellation of instruments, as may be needed, both during and at the conclusion of this case, to afford complete relief to the plaintiffs." Although the plaintiffs in the instant case specifically request "three times their damages" and "injunctive relief," both of those remedies are expressly provided under the RICO statute and are not exclusively available in federal court. *See Tafflin v. Levitt*, 493 U.S. 455, 460-61, 110 S.Ct. 792, 795-96, 107 L.Ed.2d 887 (1990) (holding that federal jurisdiction over RICO claims is concurrent and not exclusive). Consequently, had the RICO claim been part of plaintiffs' counterclaim, this relief would certainly have been requested.

Simply because some remedies sought in the instant case are different from those sought in state court does not impede the operation of claim preclusion presently. *See generally Benline v. City of Deland*, 731 F.Supp. 464, 466-68 (M.D.Fla.1989), *aff'd*, 897 F.2d 1127 (11th Cir.1990) (citations omitted); *see also Martinez v. California*, 444 U.S. 277, 283, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980). Regardless, the court finds that the slight differences in the respective prayers for relief are made even more slight by the

fact that in each action plaintiff specifically requests that the court assess whatever relief it finds just and appropriate in addition to the specific request for money damages. Still further, any difference in "the thing sued for" is far overshadowed by the fact that the factual allegations in the case at bar are all but copied from the pleading filed and adjudicated in 1994. As such, the court finds that the first element of test for claim preclusion is satisfied.

The second element of claim preclusion presents the question of whether the cause of action that was the subject of the previously issued judgment is the same as the one presently before the court. In answering this question, the court must evaluate the substance of the two actions and not simply their form. *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir.1986); *see also Albrecht v. State*, 444 So.2d 8, 12 (Fla.1984). In essence, "if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action, [then] the two cases are really the same `claim' or `cause of action' for purposes of [claim preclusion]." *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1503 (11th Cir.1990) (quoting *Ruple*

Page 1530

*v. City of Vermillion, S.D.*, 714 F.2d 860, 861 (8th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1290, 79 L.Ed.2d 692 (1984)); *see also In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1551 (11th Cir.), *cert. denied*, 498 U.S. 959, 111 S.Ct. 387, 112 L.Ed.2d 398 (1990) (acknowledging Florida's adoption of the "transactional" test set forth in Restatement (2d) of Judgments § 24 (1982)). Applying these rules, it is clear that the counterclaims to the state foreclosure action and the RICO action at bar share an identical nucleus of operative fact. As such the court finds that the second element of the test for claim preclusion is satisfied. Finally, the parties do not dispute the fact that the relevant parties to the instant case were also parties to Federal Trust's foreclosure action which gave rise to the state court counterclaim in question. Similarly, the parties do

5 of 8

not contend that the quality or nature of each party's interest in the instant case is different than in the foreclosure action and the counterclaim thereto. As such the court finds no impediment to finding elements three and four of the test for claim preclusion satisfied in the case at bar. Thus, the doctrine of claim preclusion bars the instant RICO claim as stated by PNS and the Dietels.

Notwithstanding the fact that the factual basis for the instant RICO claim has previously been before a court of competent jurisdiction and been rejected on its merits, albeit under an admittedly different technical guise, there exists a separate basis for granting Federal Trust's motion for summary judgment in the case at bar. Florida's compulsory counter claim rule bars the instant RICO claim because it is most decidedly a compulsory counterclaim which should have been presented to the state trial court along with the other counterclaims advanced there.

The Florida rule of civil procedure dealing with compulsory counterclaims tracks the corresponding federal rule. That rule, Rule 13(a) of the Federal Rules of Civil Procedure, provides in relevant part that:

A pleading shall state as a counterclaim any claim which at that time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties [over] whom the court cannot acquire jurisdiction.

Fed.R.Civ.P. 13(a) (West 1996). Applying this standard, Florida courts have long held that a compulsory counterclaim is a defendant's cause of action "arising out of the transaction or occurrence that formed the subject matter of the plaintiff's claim." *E.g., Yost v. American Nat'l Bank*, 570 So.2d 350, 352 (Fla.Dist.Ct.App.1990) (citing *City of Mascotte v. Florida Mun. Liab. Self Insurers Program*, 444 So.2d 965, 966 (Fla.Dist.Ct. App.1983), *rev. denied*, 451 So.2d 847 (Fla. 1984)). A similarly longstanding axiom is that the compulsory counterclaim rule is

designed to foreclose the possibility of duplicative litigation. Hence, Florida courts encourage a "broad, realistic interpretation" of the rule that allows the rule to accomplish its goal. *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1381 (11th Cir.1991) (quoting *Stone v. Pembroke Lakes Trailer Park, Inc.*, 268 So.2d 400, 402 (Fla.Dist.Ct.App. 1972)). If the court determines as a matter of law that a counterclaim is compulsory in nature, a party's failure to raise the counterclaim in earlier litigation constitutes a waiver of the claim. *Yost*, 570 So.2d at 352; *see also Republic Health v. Lifemark Hosps. of Fla.*, 755 F.2d 1453, 1454 (11th Cir.1985) (holding that the determination of whether a counterclaim is compulsory is made as a matter of law).

Florida courts use a "transaction or occurrence" test to determine whether a counterclaim is compulsory:

(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

(2) Would *res judicata* bar the subsequent suit on defendant's claim absent the compulsory counterclaim rule?

(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

(4) Is there any "logical relationship" between the claim and the counterclaim?

*Mascotte*, 444 So.2d at 966. If any of these transaction-or-occurrence test questions is

Page 1531

answered in the affirmative, the counterclaim in question is compulsory in nature. *Montgomery*, 932 F.2d at 1381 (citing *Roberts v. National Sch. of Radio & Television Broadcasting*, 374 F.Supp. 1266, 1270 (N.D.Ga. 1974)). "[S]ince every compulsory counterclaim must necessarily pass the `logical relationship' test," the court will proceed directly to that element of the analysis even though the foregoing discussion strongly

suggests that Federal Trust's foreclosure action and the resulting counterclaim would satisfy the other elements of the analysis as well. *Montgomery*, 932 F.2d at 1381.

"A claim has a 'logical relationship' to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." *Id.* (quoting *Neil v. South Fla. Auto Painters, Inc.*, 397 So.2d 1160, 1164 (Fla.Dist.Ct.App.1981)). The *Montgomery* court also notes that Florida courts have broadly construed the aggregate operative facts that may serve as a basis for both claims. *Id.* at 1381. With these rules in mind, and for the reasons discussed in reference to the claim preclusion issue, the court has no difficulty holding that plaintiffs' instant RICO claim springs from the same common nucleus of operative fact and, for that reason, bears a substantial logical relationship to Federal Trust's foreclosure action and the resulting counterclaims.

Indeed, Federal Trust's foreclosure action was to collect on the very loans which plaintiffs now claim are the result of Federal Trust's alleged racketeering activity. Had PNS and the Dietels prevailed in state court, the loans on which Federal Trust sought foreclosure could have been rendered illegal and unenforceable which leads logically to the conclusion that the RICO claim is a compulsory counterclaim that should have been presented to the state trial court and is, therefore, barred here.

*2. The Foreclosure Action Against O'Brien and Warren Dietel*

In actions separate from the one against PNS and the Dietels, Federal Trust brought state foreclosure actions against Warren Dietel and O'Brien. In answering the foreclosure action, both Warren Dietel and O'Brien contended that it was understood among the parties that the loans were for the benefit of PNS and the Dietels, even though the loans were made in the names of O'Brien and Warren Dietel respectively and were made solely to circumvent the per-borrower lending limit. While neither pressed counterclaims in conjunction with their answer, it is clear from the foregoing analysis that the RICO claim they now bring here is a compulsory counterclaim to the foreclosure actions pending against them in state court. Accordingly, and without rehashing the reasoning above, the court finds plaintiffs may not maintain their RICO claim here.

III. Conclusion

Based upon the foregoing analysis, the court concludes that plaintiffs' instant RICO action is essentially a recapitulation of their counterclaim to Federal Trust's foreclosure action. The state trial court issued a final judgment against PNS and the Dietels on the counterclaim. As such, the doctrine of claim preclusion prohibits PNS and the Dietels from recasting the counterclaim as a RICO action in this court. To the extent that plaintiffs allege facts and legal theories different than those advanced in state court, the court nevertheless finds the instant action arises from the same nucleus of operative fact upon which the state counterclaim was grounded. As such, the plaintiffs' claim constitutes a compulsory counterclaim to Federal Trust's foreclosure actions. Florida's compulsory counterclaim rule, therefore, bars the prosecution of that claim here by any of the instant plaintiffs. Consequently, having found no disputed issues of material fact requiring trial for resolution, the court finds that defendants are entitled to judgment as a matter of law on plaintiffs' instant claim. Accordingly, the court **GRANTS** Federal Trust's motion for summary judgment (Doc.

Page 1532

70) and instructs the clerk of court to enter the appropriate judgment.

-------------

Notes:

1. The Dietels indicated that they and PNS would need at least $1,025,000 to complete the desired expansion.

2. Although plaintiffs claim that the listed mailings are "neither exhaustive nor all inclusive," the pattern of mail fraud they allege was sufficiently developed in 1994 so that the allegations could have been included in their counterclaim. Thus, the court finds that plaintiffs' RICO claim was an "admissible matter that might have been offered" to sustain their counterclaim. *See Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). If courts were to allow plaintiffs' "continuing in nature" argument, there would be no objective point at which allegations of pattern, predicate acts would mature into a cognizable RICO claim. Congress specifically defined the requisite pattern as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5) (1994). Under this definition and the facts alleged, plaintiffs had more than enough of a pattern of mail fraud to have brought this action in their state counterclaim.

3. Hence, the court finds that the difference between plaintiffs' state counterclaim and the instant RICO claim is all but entirely semantic.