Filed Via Mail

NOV 28 2022

CLERK, US BANKRUPTCY COURT
Tampa DIVISION
45 Pages Scanned by RS

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA - TAMPA DIVISION

IN RE:

**JENNIFER KAY MARLOW AKA JENNIFER MARLOW AKA JENNIFER KAYE MARLOW,**

**Petitioner-Debtor**

CASE NO.: 8:22-bk-02494-CPM
CHAPTER 13

**DEBTOR'S REPLY TO CREDITOR'S RESPONSE TO HAVE OBJECTION TO CLAIM  NUMBER FOUR DECLARED MOOT**

**NEW PENN FINANCIAL LLC, D/B/A/ SHELLPOINT MORTGAGE SERVICING, U.S. BANK TRUST NATIONAL ASSOCIATION GMAC MORTGAGE LLC**

**Respondent**

_____/

COMES NOW, JENNIFER KAY MARLOW, AKA JENNIFER MARLOW, Debtor, to file this timely Reply to Creditor's Response to have Objection to claim Number (4) Declared Moot. The Response by counsel for U.S. Bank Trust solely as trustee of the Truman 2021 SC9 Title Trust by and through undersigned counsel lacks merit. There is no bona fide record in evidence in this case wherein US. Bank properly attained the position of a trustee of the Truman 2021 SC9 Title Trust. The Response by Ida A. Moghimi-Kian of 11/17/2022 as counsel states at paragraph (2.) : "The Claim is based upon a matured loan to which a Final Judgment was entered on October 28, 2019 in favor of the Creditor."

`        There is an old cliché': attorneys like to start on the (50) yard line.

Herein we will go back to kick off. That is the right thing to do. So this alleged Debtor says:

There was no matured loan as there was no loan at all. There was a credit swap from acceptance of the promissory note whereafter the alleged Bank-Lender *did not* post a matching collateral deposit

1

pursuant to *12 CFR 223.14* to create an actual Bank loan. For want of jurisdiction, there is no enforceable contract which bound or binds the Debtor(s).

No adherence to the regulation, Id. means no binding mortgage agreement.

"For want of consideration" there was no binding agreement to file a Notice of Default on to lead to a foreclosure. The Federal Rules of Evidence at 201, et. Seq., are herein invoked.

Therefore the original so-called mortgage debt was actually "zero" because the Plaintiff's financial asset was exchanged for FED's promissory notes, and/or credit only, in an even-up exchange. Such even-up exchange is explained fully in the booklet  Modern Money Mechanics, from the Federal Reserve Bank of Chicago, Ill., Remember the U.S. Congress gets its so-called money from the Federal Reserve Banks.

But pursuant to Commercial law, in the UCC at 4A-104 the only "Originator" of the funds, which was mistakenly called a loan, was the person who put their "live signature" on the promissory note near the time of the alleged loan. Can mere 'credit' be deemed a loan?

A booklet published by the Federal Reserve Bank of New York tells us:

"Currency cannot be redeemed, or exchanged, for Treasury gold or any other asset used as backing. The question of just what assets 'back' Federal Reserve notes has little but bookkeeping significance."

Elsewhere in the same publication we are told: "Banks are creating money based on a borrower's promise to pay (the I.O.U.)...Banks create money by 'monetizing' the private debts of businesses and individuals."

In a booklet entitled **Modern Money Mechanics**, the Federal Reserve Bank of Chicago says:

"In the United States neither paper currency nor deposits have value as commodities. Intrinsically, a dollar bill is just a piece of paper. **Deposits are merely book entries**. Coins do have some intrinsic value as metal, but generally far less than their face amount."

## PLEASE TAKE JUDICIAL NOTICE

The presiding Judge in this case is under oath of office to the U.S. Constitution.

The lawyer(s) who file their pleadings are officers of the court and must operate with Integrity so as not to lose their bonded positions.

*From the supreme law of the land:* Article 1, Section 8, clause 5 states:

"***Congress*** shall have the power to coin money, regulate the value thereof, and of foreign coin, and fix the standard of weights and measures." (emphasis, mine)

Article 1, Section 10 in part states:

"No state shall use any Thing but gold and silver coin as a tender in payment of its debts;"

Mining is difficult and expensive. *Bookkeeping entries cost virtually nothing.*

Looking at the definition of "Bank" in the 4th Edition of Black's Law Dictionary it says:

"An institution, of great value in the commercial world, empowered to receive deposits of money, to make loans, and to issue its promissory notes (designed to circulate as money, and commonly called 'bank notes' or 'bank-bills,') or to perform any one or more of these functions."

If a promissory note is designed to circulate as money, like money it can be deposited into a

checking account.

Such fact was never disclosed in the bank loan agreement.

You see, if gold and silver coin were the money, the current credit creation banking system

could not exist. Our founding fathers knew that.

## BANKRUPTCY RULE 9024

Under Bankruptcy Rule 9024 the court looks to Federal Rule of Civil Procedure 60(b) when

applied and argued for by the Debtor. To wit:

On motion and just terms, the court may relieve a party or its legal representative from a final

judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Sections (3), (4), (5) and (6) of rule 60(b) above are claimed applicable by this Debtor.

## STARTING AT KICK-OFF

There was no "matured" loan as claimed by U.S. Bank ...solely as trustee in this case.

Point (18)(b) on the original mortgage foreclosure complaint, a 'verified' complaint states:

That the lawyers for GMAC Mortgage LLC have the court Order that the Mortgage lien is a

valid first lien and has priority over every other lien of record at that time. The Court ordered so. Thus

with no evidence of a Loan in compliance with 12 CFR 223.14, the entry of such an Order was

voidable and void for want of consideration in contract. Furthermore, the Lender was Sentinel

Mortgage Company not GMAC. Only Sentinel ..can appoint the trustee, not GMAC. Additionally,

paragraph (H) of the original mortgage agreement section on "Applicable Law' includes the federal

regulation above that was breached by the Plaintiff in the foreclosure verified complaint. The original

Note of November 4th 2002 expresses a past tense verbage that is a false fact. To Wit: In return for the

'loan I have received" I promise to pay $210.000 to the Lender Sentinel Mortgage. There was no loan

received Nov. 4th 2002 as it takes about (5) days for the real property to be pledged against the alleged

Banking Loan.

## THE ORIGINAL 'VERIFIED' FORECLOSING PLAINTIFF LACKED STANDING

Of particular importance is that the Note allonges, (2) of them directed to GMAC..... are un-

dated. The following Florida court ruled:

"' 'Where the plaintiff files the original note after filing suit, an undated blank endorsement on
the note is insufficient to prove standing at the time the initial complaint was filed.' ' Kelly v. Bank of
N.Y. Mellon, 170 So.3d 145, 146 (Fla. 1st DCA 2015) (citation omitted)..." Kyser v. Bank of Am.,
N.A., 186 So.3d 58 (Fla. App. 2016)

In the note that was attached to the 'verified' complaint there were NOT one, but TWO

Allonges to GMAC… and neither one was dated.

'When a plaintiff asserts its standing based on an undated endorsement of the note, it has to
show that the endorsement occurred before the filing of the complaint through additional evidence,
such as the testimony of a litigation analyst. Id. (reversing the foreclosure judgment because the
mortgage resolution associate for a prior servicer of the loan at issue, who testified that the appellee

4

was the holder of the note based on her review of the loan servicer's records, did not establish that the note had been endorsed at the time of the filing of the complaint).'
Kyser v. Bank of Am., N.A., 186 So.3d 58 (Fla. App. 2016)

"Accordingly, because Appellee failed to establish that it had standing to file the foreclosure case against Appellant, we reverse the Final Judgment for Foreclosure.

REVERSED.-
SWANSON and WINOKUR, JJ., concur." Kyser v. Bank of Am., N.A., 186 So.3d 58 (Fla. App. 2016)

The Notice of Intent Affidavit of Secured Interest filed by the Debtor, on record in this case, and the proffered Senate Document (43) of the year 1933 , so raised in the last zoom session, represent the highest Lien holder, and Highest title holder. The lawyer(s) involved have committed gross misrepresentation of the facts behind this foreclosure related bankruptcy case, and therefore should be disciplined and sanctioned. The foreclosure Judgment of record cannot stand for want of jurisdiction, etc. (see) above.  The Debtor reserves the right to amend this Response and demurrers to previous filings for the totality of her arguments and claims. Finally, for the Plaintiff, alleged Creditor to make an 'honest' case, there is requested a full evidentiary hearing on these matters above.

Dated: Nov. 25, 2022

Exhibits attached

All Rights Reserved'
s/ Jennifer Kay Marlow

Jennifer Kay Marlow, pro se, alleged Debtor
94 Tatum Rd
Sarasota, FL 34240

Kyser v Bank of America
Original Mortgage Complaint
Senate Document 43

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this day, *Nov. 25,* 2022 a copy of the foregoing was furnished electronically, EMAIL OR FAX or via first class mail upon:

JON M WAAGE
P.O.BOX 25001
BRADENTON, FL, 34206

UNITED STATES TRUSTEE-FTM7/13
TIMBERLAKE ANNEX, SUITE 1200
501 E. POLK STREET
TAMPA, FLORIDA 33602
U.S. Trustee

US BANK TRUST
DIAZ ANSELMO & ASSOCIATES P.A.
P.O.BOX 19519
FORT LAUDERDALE, FL. 33318  (954) 564-9252

US BANK TRUST N.A
100 WALL STREET      16TH FLOOR
NEW YORK, NEW YORK 10005

TD BANK USA, N.A.
2001 WESTERN AVE. STE 400
SEATTLE, WA. 98121

ACHIEVA CREDIT UNION
c/o o  GIBBONS NEUMAN LAW
3321 HENDERSON BLVD
TAMPA, FL. 33609   (813) 877- 9290

ACHIEVA CREDIT UNION

P. O. Box 1500
Dunedin, Florida34697

RESURGENT CAPITAL SERVICES
P.O. BOX 1927
GREENVILLE S.C. 29602

All Rights Reserved
/s/  *Jennifer Kay Marlow*
Jennifer Kay Marlow
Jenniferlm4994@gmail.com
c/o  94 Tatum Road
Sarasota, Florida
941-209-2100

186 So.3d 58

**Prapapun KYSER, Appellant,**

v.

**BANK OF AMERICA, N.A., et al., Appellee.**

No. 1D15–1027.

### District Court of Appeal of Florida, First District.

### Feb. 23, 2016.

Steven Copus of Copus & Copus, P.A., Shalimar; George M. Gingo and James Orth of Gingo & Orth, P.A., Titusville, for Appellant.

Mary J. Walter of Liebler, Gonzalez & Portuondo, Miami, for Appellee.

LEWIS, J.

Appellant, Prapapun Kyser, appeals the Final Judgment for Foreclosure entered in favor of Appellee, Bank of America, N.A., arguing that Appellee lacked standing to bring the foreclosure action against her pursuant to a mortgage where Countrywide Home Loans, Inc. was the lender. We agree and, therefore, reverse.

We review the sufficiency of the evidence to prove standing to bring a foreclosure action de novo. *Pennington v. Ocwen Loan Servicing, LLC,* 151 So.3d 52, 53 (Fla. 1st DCA 2014). A plaintiff who is not the original lender may establish standing to foreclose by submitting a note with a blank or special endorsement, an assignment of the note, or an affidavit otherwise proving its status as holder of the note. *Id.* Standing must be established at the time of the filing of the foreclosure action, and a bank must also have standing at the time a final judgment is entered. *Id.*

In this case, the promissory note attached to the foreclosure complaint did not contain any endorsements. Although Appellee subsequently filed what it represented to be the original mortgage and note and although its witness confirmed during the bench trial that a blank endorsement

[186 So.3d 60]

was included on the back of one of the pages of the note, we have explained, " 'Where the plaintiff files the original note after filing suit, an undated blank endorsement on the note is insufficient to prove standing at the time the initial complaint was filed.' " *Kelly v. Bank of N.Y. Mellon,* 170 So.3d 145, 146 (Fla. 1st DCA 2015) (citation omitted). When a plaintiff asserts its standing based on an undated endorsement of the note, it has to show that the endorsement occurred before the filing of the complaint through additional evidence, such as the testimony of a litigation analyst. *Id.* (reversing the foreclosure judgment because the mortgage resolution associate for a prior servicer of the loan at issue, who testified that the appellee was the holder of the note based on her review of the loan servicer's records, did not establish that the note had been endorsed at the time of the filing of the complaint).

Moreover, while Appellee attached an Assignment of Mortgage to its Complaint, that assignment made no mention or reference to the promissory note. "[A]n assignment of mortgage, even if executed before the foreclosure action commenced, is insufficient to prove standing where the assignment reflects transfer of only the mortgage, not the note." *Titus v. AS Michai LLC,* 161 So.3d 1284, 1286 (Fla. 4th DCA 2015) (holding that the plaintiff's documents failed to demonstrate standing to foreclose where the undated blank endorsement on the original note, which was filed over a month after the suit was filed, was insufficient to prove standing and where the assignment reflected only an assignment of the mortgage, not the note); *see also Lamb v. Nationstar Mortg., LLC,* 174 So.3d 1039, 1041 (Fla. 4th DCA 2015) (holding that the appellee did not prove its standing to enforce the note through evidence of an assignment because the assignment assigned only the mortgage and noting that while its witness testified that the appellee acquired Aurora, the witness did not testify that the appellee acquired the particular


Exhibit A
1 of 3

fastcase

note which bore a special endorsement to Aurora); *Bristol v. Wells Fargo Bank, Nat'l Ass'n*, 137 So.3d 1130, 1132–33 (Fla. 4th DCA 2014) ("Here, the bank filed the original note more than two years after the complaint was filed. The note contained an undated, blank indorsement, which was insufficient to prove standing at the time the complaint was filed.... The bank relies on the 'Assignment of Mortgage' ... to support standing, but the 'assignment of mortgage reflects transfer of only the mortgage, not the note.' ") (Citation omitted); *Lindsey v. Wells Fargo Bank, N.A.*, 139 So.3d 903, 906 (Fla. 1st DCA 2013) (reversing the summary judgment entered in favor of the appellee where the original note named Option One, not the appellee, as the lender, the original note was not endorsed in blank or otherwise assigned to the appellee, and the assignment applied only to the mortgage, not the note).

During the bench trial, Appellee's witness testified on cross-examination that she believed Appellee came into possession of the original mortgage and promissory note in 2005 when the mortgage was executed. Importantly, however, the witness did not know when the blank endorsement was affixed to the note. "[A] plaintiff must prove not only physical possession of the original note but also, if the plaintiff is not the named payee, possession of the original note endorsed in favor of the plaintiff or in blank.... If the foreclosure plaintiff is not the original, named payee, the plaintiff must establish that the note was endorsed (either in favor of the original plaintiff or in blank) before the filing of the complaint in order to prove standing as a holder." *Kiefert v. Nationstar Mortg.,*

[186 So.3d 61]

*LLC*, 153 So.3d 351, 353 (Fla. 1st DCA 2014) (holding that the appellee failed to establish that the original plaintiff, Aurora Loan Services, LLC, had standing to foreclose and noting that while the appellants' counsel pressed the appellee's witness concerning his knowledge, if any, of when the note had been endorsed, the witness's "testimony established only that Aurora was in possession of the note at the time the complaint

was filed, not that the note had been endorsed at the time the complaint was filed"); *see also Sosa v. U.S. Bank Nat'l Ass'n*, 153 So.3d 950, 951–52 (Fla. 4th DCA 2014) (holding that the appellee failed to establish standing to foreclose where the original note and the allonge to the note were filed after the foreclosure complaint and each contained undated special endorsements and where the appellee's analyst never stated when the appellee became the owner of the note and explaining that "[a]lthough the analyst testified that [the appellee's servicer] came into possession of the note prior to filing the foreclosure action, such testimony is not dispositive as it is still unclear when [the appellee], through the placement of the special endorsement, became the owner of the note"). *Cf. Seidler v. Wells Fargo Bank, N.A.*, 179 So.3d 416, 420 (Fla. 1st DCA 2015) (explaining that a dated blank endorsement constituted evidence to support a finding that the note became payable to the bearer and thus enforceable via possession alone over two years prior to the filing of the foreclosure complaint); *Peuguero v. Bank of Am., N.A.*, 169 So.3d 1198, 1203 (Fla. 4th DCA 2015) (holding that the bank established standing to sue and noting that "the witness responded in the affirmative to a cross-examination inquiry as to whether the endorsements on the allonge were 'definitely put on before the filing of the complaint' " and that she testified that Countrywide owned and held the note when the complaint was filed and that its policy was to have notes endorsed before foreclosure complaints are filed). While Appellee's witness also testified that Appellee and Countrywide merged, she gave no testimony that Appellee acquired all or any of Countrywide's assets. *See Fiorito v. JP Morgan Chase Bank, Nat'l Ass'n*, 174 So.3d 519, 521–22 (Fla. 4th DCA 2015) (holding that the appellee failed to establish standing to sue for foreclosure where the bank officer testified that the appellee merged with "WAMU" but never testified that the appellee acquired all of WAMU's assets).

Accordingly, because Appellee failed to establish that it had standing to file the foreclosure case against Appellant, we reverse the Final Judgment for Foreclosure.



A 3
2 b

REVERSED.

SWANSON and WINOKUR, JJ., concur.



IN THE CIRCUIT CIVIL COURT OF THE TWELFTH JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR SARASOTA COUNTY
CIVIL DIVISION

GMAC MORTGAGE, LLC

     Plaintiff,

vs.
                                          Case No.

MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW    Division
94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW
94 FAMILY TRUST, SARASOTA COASTAL CREDIT UNION,, UNITED
STATES OF AMERICA, INTERNAL REVENUE SERVICE, AND
UNKNOWN TENANTS/OWNERS,

     Defendants.
_____/

### VERIFIED MORTGAGE FORECLOSURE COMPLAINT

Plaintiff, GMAC MORTGAGE, LLC, by and through its undersigned attorneys, sues Defendants, MICHAEL D. HARRIS aka

MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW 94

FAMILY TRUST, SARASOTA COASTAL CREDIT UNION,, UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE,

and UNKNOWN TENANTS/OWNERS, and states:

### GENERAL ALLEGATIONS

1.    As of the date of the execution of this complaint, GMAC MORTGAGE, LLC, is the holder of the Note and Mortgage

which are the subject of this suit.

2.    Defendant(s), MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and

UNKNOWN BENEFICIARY OF THE MARLOW 94 FAMILY TRUST, is/are the record owner(s) of the property sought to be foreclosed

by the Plaintiff, and hold title to the property subject to the Mortgage described herein.

3.    Defendants, SARASOTA COASTAL CREDIT UNION,, UNITED STATES OF AMERICA, INTERNAL REVENUE

SERVICE, and UNKNOWN TENANTS/OWNERS, are persons and/or entities who have or may claim some right, title, interest, or lien

in, to, or upon the Property described below.

4.    On November 4, 2002, RALPH V. MARLOW, executed and delivered a Note, and a Mortgage securing the Note in favor

of SENTINEL MORTGAGE COMPANY.  The Mortgage was signed and executed by RALPH V. MARLOW and JENNIFER K.

MARLOW, husband and wife and was recorded on November 21, 2002 as instrument number 2002194105 and was assigned to

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for GMAC BANK, ISAOA, ATIMA recorded on

11/21/2002 in Instrument 2002194106, of the Public Records of Sarasota County, Florida.  A copy of the Mortgage and Promissory

Note is attached hereto.  Said Note and Mortgage were subsequently assigned and/or endorsed in favor of the Plaintiff.

5.    Mortgagee shown on the Mortgage attached as an exhibit is the original Mortgagee. Plaintiff is now entitled to

enforce Mortgage and Mortgage Note pursuant to Florida Statutes 673.3011.

6.    A default exists under the Note and Mortgage as a result of a lack of payment of the installment due October 1,

2010, and all subsequent payments on the Note.

7.    Plaintiff has, if required by the Note or Mortgage, demanded payment of the obligation reflected by the aforesaid

Note and Mortgage, but despite such demand, said default has not been cured.

8.    Plaintiff hereby accelerates all principal and interest under the Note and Mortgage to be immediately due and payable.

9.    Plaintiff is due the sum of ONE HUNDRED TWENTY-FOUR THOUSAND SIX HUNDRED NINETEEN AND 64/100 Dollars ($124,619.64) in principal under the Note and Mortgage, plus interest from September 1, 2010, title search expenses for ascertaining necessary parties to this action, unpaid taxes, insurance premiums, accumulated late charges, and inspection fees.

10.    As a result of the default under the Note and Mortgage, it has become necessary for the Plaintiff to employ the undersigned attorneys to prosecute this action, and Plaintiff has agreed to pay such attorneys a reasonable fee for their services. Under the terms and provisions of the Note and Mortgage, Plaintiff is entitled to recover its reasonable attorney's fees in bringing this action. Plaintiff alleges that a reasonable attorney's fee in this matter would be $1,200.00 and will seek an award of such amount in the event that a default judgment is entered against the Defendant. In the event that this matter is contested, Plaintiff intends to seek additional attorney's fees based upon the hours spent, services rendered and other reasonable factors.

11.    Defendant(s), MICHAEL D. HARRIS aka MICHAEL HARRIS, TRUSTEE OF MARLOW 94 FAMILY TRUST and UNKNOWN BENEFICIARY OF THE MARLOW 94 FAMILY TRUST, and/or UNKNOWN TENANTS/OWNERS, now own, possess, or have the right to possess the Property.

12.    Defendant(s), SARASOTA COASTAL CREDIT UNION, may claim some interest in the subject property by virtue of judgment, lien, or other instrument recorded on 05/24/2002 as instrument number 2002084250, of the Public Records of Sarasota County, Florida. Said interest should be removed from the chain of title on the subject property because upon information and belief, such mortgage has been paid in full, but not released or satisfied of record, and thus is subordinate and inferior to a lien of Plaintiff's mortgage.

13.    Defendant(s), UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE, may claim some interest in the subject property by virtue of Notice of Federal Tax Lien, RALPH V MARLOW, whose residence was 94 TATUM RD, SARASOTA, FL 34240-9105, and said lien was recorded in the public records of SARASOTA County, Florida on 04/26/2010, in Official Records Book , Page , which notice was prepared by BALTIMORE, MD.

14.    Defendant(s), UNKNOWN TENANTS/OWNERS, may claim some interest in the subject property by virtue of their possession of the property.

## COUNT 1
## MORTGAGE FORECLOSURE

15.    Plaintiff realleges and incorporates Paragraphs 1 through 14 of this Complaint.

16.    This is an action to foreclose the first Mortgage on real property (the "Property") in Sarasota County, Florida, having a legal description as follows:

BEGIN AT THE SOUTHEAST CORNER OF TRACT 35, OF PALMER FARMS 3rd UNIT , AS RECORDED IN PLAT BOOK 3, PAGE 39, PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA; THENCE NORTH 0° 01' 18" EAST ALONG THE WEST LINE OF TATUM ROAD, 444.0 FEET FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 0° 01' 18" EAST,

212.35 FEET; THENCE NORTH 88°37' WEST, 200 FEET; THENCE SOUTH 0°01' 18" WEST, 212.35 FEET; THENCE SOUTH 88°37' EAST 200 FEET TO THE POINT OF BEGINNING.

with a street address of 94 TATUM ROAD, SARASOTA, FL 34240, herein referred to as "the Property."

17.     Under the terms of the Mortgage and in accordance with Florida law, Plaintiff is entitled to foreclosure of its Mortgage upon default in payment.

18.     All conditions precedent to the enforcement of Plaintiff's right to foreclosure herein and the maintenance of this action have been performed, have occurred, or have been waived.

WHEREFORE, Plaintiff requests that this honorable Court:

(a)     Take jurisdiction of the parties hereto and of the subject matter hereof;

(b)     Order that the lien of Plaintiff's Mortgage is a valid first lien on the Property described and is superior to any lien of record ;

(c)     Order foreclosure of the Mortgage, and that all Defendants named herein, their estates, and all persons claiming under or against them since the filing of the Notice of Lis Pendens, be foreclosed;

(d)     Determine the amount due Plaintiff under the Note and Mortgage sued upon herein;

(e)     Order that if said sum due Plaintiff is not paid in full within the time set by this Court, the Property be sold by Order of this Court to satisfy Plaintiff's claims;

(f)     Order that if the proceeds from such court ordered sale are insufficient to pay Plaintiff's claim, then a deficiency judgment be entered for the remaining sum against all Defendants who have assumed personal liability for same and who have not received a discharge in bankruptcy;

(g)     Order delivery and possession of the real property to the Purchaser, who shall be responsible for condominium or homeowner association assessments and other charges in accordance with §§718.116 and 720.3085, Florida Statutes (2007), respectively.and upon proof of the demand or refusal of any Defendant to vacate and surrender such possession, and the clerk be directed to issue a writ of possession without further order of this Court;

(h)     Retain jurisdiction of this cause and the parties hereto to determine Plaintiff's entitlement to a deficiency judgment and the amount thereof; and

(i)     Grant such other and further relief as appears just and equitable under the circumstances.

### COUNT II
### REFORMATION OF QUIT CLAIM DEED

19.     This is an action to reform the Quit Claim Deed held by Plaintiff.

20.     Paragraphs 1, 2, 4 and 5 are hereby incorporated and made a part of this Count.

21.     The Quit Claim Deed, prepared by Plaintiff's predecessor, contains a scrivener's error in the legal description. The parties intended that Plaintiff's predecessor have a valid Quit Claim Deed on the subject property.

BEGIN AT THE SOUTHEAST CORNER OF TRACT 35, OF PALMER FARMS 3rd UNIT , AS RECORDED IN PLAT BOOK 3, PAGE 39, PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA; THENCE NORTH 0° 01' 18" EAST ALONG THE WEST

LINE OF TATUM ROAD, 444.0 FEET FOR A POINT OF BEGINNING; THENCE CONTINUE NORTH 0° 01' 18" EAST, 212.35 FEET; THENCE NORTH 88°37' WEST, 200 FEET; THENCE SOUTH 0°01' 18" WEST, 212.35 FEET; THENCE SOUTH 88°37' EAST 200 FEET TO THE POINT OF BEGINNING.

22.    Plaintiff and Defendant are the only parties having an interest in the reformation of the Quit Claim Deed.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiff reforming the Quit Claim Deed to correct the scrivener's error in the legal description.

**COUNT III**
**QUIET TITLE**

23.    This is an action to quiet title on real property.

24.    Paragraphs 1 through 10 and 12 are hereby incorporated and made a part of this Count III.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiff removing the Mortgage found in instrument number 2002194105 of the Public Records of Sarasota County, Florida, from the chain of title on the subject property.

**NOTICE UNDER FAIR DEBT COLLECTION PRACTICES ACT**

Pursuant to Title 15 United States Code Section 1692g(d), a communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a) of this section.

DATED: _2/15/11_ .

☐ Erin M. Berger/Florida Bar #014977
☐ Elizabeth M. Ferrell/Florida Bar #052092
☐ Adam J. Hardman/Florida Bar #037533
☐ Clay A. Holtsinger/Florida Bar #294330
☐ Frances E. Johnson/Florida Bar #543055
☐ Christopher C. Lindhardt/Florida Bar #0028046
☐ Zachary A. Liszt/Florida Bar #041367
☐ Ian MacAlister/Florida Bar #086105
☐ Nicole M. Mariani/Florida Bar #069883
☐ Richard S. McIver/Florida Bar #559120
☐ Laura E. Noyes/Florida Bar #065454
☐ Edward B. Pritchard/Florida Bar #712876
☐ Melissa R. Rinaldi/Florida Bar #050252
☐ Mitchell B. Rothman/Florida Bar #870560
☐ Grace S. Santos/Florida Bar #029518
☐ Ashley L. Simon/Florida Bar #064472
☒ Joan Wadler/Florida Bar #894737
Kass, Shuler, Solomon, Spector,
Foyle & Singer, P.A., Attorneys for Plaintiff
P.O. Box 800, 1505 N. Florida Ave.
Tampa, FL 33601
(813) 229-0900

327610/1100518/jsm

IN THE CIRCUIT CIVIL COURT OF THE TWELFTH JUDICIAL CIRCUIT
OF FLORIDA, IN AND FOR SARASOTA COUNTY
CIVIL DIVISION

GMAC MORTGAGE, LLC

    Plaintiff,

                                       Case No.

vs.

                                       Division

MICHAEL D. HARRIS aka MICHAEL HARRIS,
TRUSTEE OF MARLOW 94 FAMILY TRUST and
UNKNOWN BENEFICIARY OF THE MARLOW 94
FAMILY TRUST, et. al.

    Defendants.

## VERIFICATION OF FORECLOSURE COMPLAINT

        Under penalty of perjury, I declare that I have read the foregoing Mortgage Foreclosure Complaint, and the facts alleged therein are true and correct to the best of my knowledge and belief.

GMAC MORTGAGE, LLC   Perry Coleman

By: _____

As the: _____Authorized Officer____

For: GMAC MORTGAGE, LLC

Date: __2/10/2011__

327610/1100518/jsm

FEB 1 4 2011

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002194105 13 PGS
2002 NOV 21 01:42 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
DWANNING Receipt#245057

Doc Stamp-Mort:    756.00
Intang. Tax:       432.00

After Recording Return To:
Sylvia J. Taylor, P.A.
1819 Main Street, Suite 400A
Sarasota, FL 34236
Prepared by:
Sentinel Mortgage Company
1819 Main Street, Suite 301
Sarasota, FL 34236
(941) 365-5626

Loan No

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   November 4, 2002
together with all Riders to this document.

(B) "Borrower" is
Ralph V. Marlow and Jennifer K. Marlow, husband and wife

Borrower is the mortgagor under this Security Instrument.

(C) "Lender" is  Sentinel Mortgage Company

Lender is a
organized and existing under the laws of  Florida
Lender's address is  1819 Main Street, Suite 301
            Sarasota, FL  34236
Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated  November 4, 2002
The Note states that Borrower owes Lender  Two Hundred Sixteen Thousand  DOLLARS and Zero CENTS

Dollars (U.S. $ 216,000.00          ) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   November 1, 2017

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-6655
LFI #FNMA3010  1/01  (A)                    Page 1 of 13       Initials

OFFICIAL RECORDS INSTRUMENT # 2002174105 13 PGS

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ 1-4 Family Rider
☐ Biweekly Payment Rider    ☐ V.A. Rider
☐ Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (a) principal and interest under the Note, plus (b) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01
Page 2 of 13    Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the

| County | of | Sarasota |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

Begins at the Southeast corner of Tract 35, Palmer Ranch, Third Unit, according to the plat thereof recorded in Plat Book 3, Page 38, of the Public Records of SARASOTA County, Florida; thence North 00 degrees 1 minute 18 seconds East, along the West line of Tatum Road, a distance of 444.0 feet for a Point of Beginning; thence continue North 00 degrees 1 minute 18 seconds East, a distance of 212.35 feet; thence North 88 degrees 37 minutes West, a distance of 200 feet; thence South 00 degrees 1 minute 18 seconds West, a distance of 212.35 feet; thence South 88 degrees 37 minutes East, a distance of 200 feet to the Point of Beginning.

which currently has the address of
94 Tatum Road
[Street]

Sarasota          , Florida     34240          ("Property Address"):
[City]                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01                    Page 3 of 18      Initials: _____

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01                    Page 4 of 13    Initials: _RCM_ _JKM_

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these Items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010 1/01

Page 5 of 13        Initials: _R.M_  _J.K.M._

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010 1/01                                    Page 6 of 13                          Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010 - 101                           Page 7 of 13        Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 448-3555
LFI #FNMA3010  1/01

Page 8 of 13     Initials: _RM_ _JKM_

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 pgs

Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver.  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successor in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successor in Interest of Borrower.  Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several.  However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  Loan Charges.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under

FLORIDA - Single Family - Fannie Mae/Freddie Mac  UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010 - 1/01          Page 9 of 13        Initials: RM  JKM

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms,

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01                    Page 10 of 13     Initials: _R.D.M._   _J.K.M._

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01

Page 11 of 13    Initials: _RM_  _JKM_

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Attorneys' Fees. As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

25. Jury Trial Waiver. The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010  1/01                    Page 12 of 13        Initials:

OFFICIAL RECORDS INSTRUMENT # 2002194105 13 PGS

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Diana L. Crum_ (signature)
Diana L. Crum

_Ralph V. Marlow_ (signature) _____ (Seal)
Ralph V. Marlow                                    -Borrower

_Sylvia J. Taylor_ (signature)
Sylvia J. Taylor

_Jennifer K. Marlow_ (signature) _____ (Seal)
Jennifer K. Marlow                                 -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

————————————— [Space Below This Line For Acknowledgment] —————————————

**STATE OF FLORIDA,**                                    **County ss:**

I hereby certify that on this day, before me, an officer duly authorized in the state aforesaid and in the county aforesaid to take acknowledgements, personally appeared
**Ralph V. Marlow and Jennifer K. Marlow, husband and wife**

known to me to be the person(s) described in and who executed the foregoing instrument or who (has) (have) produced                                            as identification and did (did not) take an oath and acknowledged before me that he/she/they executed the same for the purpose therein expressed.

**WITNESS** my hand and official seal in the county and state aforesaid this   4th   day of November   , 2002.

My Commission expires:

_Sylvia Taylor_ (signature)
                                                        - Notary Public

OFFICIAL NOTARY SEAL    (Seal)
SYLVIA TAYLOR
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC914745
MY COMMISSION EXP. JULY 26, 2003

**FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3010 1/01
Laser Forms Inc. (800) 446-3555
LFI #FNMA3010   1/01                    **Page 15 of 15**

Documents produced by DataTree LLC via it's proprietary imaging and delivery system. Copyright 2003, All rights reserved

```
RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002194106 2 PGS
      2002 NOV 21 01:42 PM
        KAREN E. RUSHING
       CLERK OF CIRCUIT COURT
     SARASOTA COUNTY,FLORIDA
   DMANNING  Receipt#245057
```



**2002194106**

Return to Sylvia J. Taylor, P.A.
1819 Main Street, Suite 400A
Sarasota, FL 34236

2132

① ————————————————— [Space Above This Line For Recording Data] —————————————————

Parcel Tax ID #: 0217-16-0027
This form was prepared by:  Sentinel Mortgage Company
address:  1819 Main Street, Suite 301
          Sarasota, FL 34236
tel. no: (941) 365-5526

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is
1819 Main Street, Suite 301, Sarasota, FL 34236
does hereby grant, sell, assign, transfer and convey, unto the
Mortgage Electronic Registration Systems, Inc., ISAOA, as nominee for GMAC Bank, ISAOA, ATIMA
a corporation organized and existing under the laws of                    (herein "Assignee"),
whose address is   100 Witmer Road, Horsham, PA 19044
a certain Mortgage dated  November 4, 2002               , made and executed by
Ralph V. Marlow and Jennifer K. Marlow, husband and wife

to and in favor of  Sentinel Mortgage Company
                                            upon the following described property situated in
                          Sarasota  County, State of  Florida
Begins at the Southeast corner of Tract 35, Palmer Ranch, Third Unit, according to the plat thereof
recorded in Plat Book 3, Page 38, of the Public Records of SARASOTA County, Florida; thence North 00
degrees 1 minute 18 seconds East, along the West line of Tatum Road, a distance of 444.0 feet for a
Point of Beginning; thence continue North 00 degrees 1 minute 18 seconds East, a distance of 212.35
feet; thence North 88 degrees 37 minutes West, a distance of 200 feet; thence South 00 degrees 1
minute 18 seconds West, a distance of 212.35 feet; thence South 88 degrees 37 minutes East, a
distance of 200 feet to the Point of Beginning.

     MIN Number: 100037506004619541

     MERS Phone No.: 1-888-679-MERS

such Mortgage having been given to secure payment of  216,000.00
                                        (include the Original Principal Amount)

Laser Forms Inc. (800) 446-3555
LFI#LFISMP 11/98                 Page 1 of 2        Initials _____

Documents produced by DataTrace LD via E's (retardation) imaging and delivery system. Copyright 2003, All rights reserved

OFFICIAL RECORDS INSTRUMENT # 2002194106 2 PGS

which Mortgage is of record in Book, Volume, or Liber No. **Inst # 2002194105** , at page
(or as No.                    ) of the             Records of **Sarasota**
County, **Florida**                         , together with the note(s) and obligations therein described and
the money due and to become due thereon with interest, and all rights accrued or to accrue under such
Mortgage.

   TO HAVE AND TO HOLD the same unto Assignee, its successor and assigns, forever, subject only to the
terms and conditions of the above-described Mortgage.

   IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on
November 4, 2002

_____          Sentinel Mortgage Company
Witness (Print Name)                            (Assignor)

**Brenda I. Whitehurst**

_____          By _____
Witness (Print Name)                               (Signature)
                                               (Print Name & Title)
**Dierdre Krone**
                                         **Linda G. Wilf**
_____          **Executive Vice President**
Assist (Print Name)


Seal:

_____  [Space Below This Line Reserved For Acknowledgment]  _____

**STATE OF Florida**
**COUNTY OF Sarasota**

On **November 4, 2002**                         before me, the undersigned, a Notary Public in and for
said County and State, personally appeared   **Linda G. Wilf**
known to me to be the   **Executive Vice President**
and                                                                     , known to me to be
                                                                of the corporation herein which
executed the within instrument, that the seal affixed to said instrument is the corporate seal of said
corporation, that said instrument was signed and sealed on behalf of said corporation pursuant to it's by-laws
or a resolution of it's Board of Directors and that he/she acknowledges said instrument to be the free act and
deed of said corporation.

KATHERYN J. SCHOL
MY COMMISSION # DD 138111
EXPIRES: September 15, 2005
Bonded Thru Notary Public Underwriters

_____
**Katheryn J. Schol**
Notary Public
My Commission Expires   **09/15/2005**

**(THIS AREA FOR OFFICIAL**
**NOTARIAL SEAL)**                        **Sarasota**                              County,
                                         **Florida**

Legal Forms Inc. (800) 446-3805
LF1 #LFBMP 11/00            **Page 2 of 2**

# NOTE
### (FLORIDA FIXED RATE)

Loan ████████

| November 4, 2002 | Sarasota | Florida |
|---|---|---|
| [Date] | [City] | [State] |

94 Tatum Road
Sarasota, FL 34240
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $216,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Sentinel Mortgage Company

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on December 1, 2002. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on November 1, 2017, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1819 Main Street, Suite 301 Sarasota, FL 34236 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,750.61

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a)

FLORIDA FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Form 3210 1/01
Laser Forms Inc. (800) 446-3555

Page 1 of 3          Initials ████

any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Ralph V. Marlow                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                        -Borrower

Pay to the Order of
GMAC Mortgage Corporation
Without Recourse

_____ [Signature Only]
Joanne Wight, Vice President
Acting Agent for GMAC Bank

Pay to the order of GMAC Bank, ISAOA without recourse
this 4th day of November, 2002

_____
Sentinel Mortgage Company
Linda G. Wilf, Executive Vice President

PAY TO THE ORDER OF

WITHOUT RECOURSE
GMAC MORTGAGE CORPORATION

_____
J. Vollmer
Limited Signing Officer

FLORIDA FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Form 3210 1/01
Laser Forms Inc. (800) 446-3555

Page 2 of 3

73D CONGRESS⎰
1st Session ⎰      SENATE      ⎱DOCUMENT
     ⎱No. 43

# CONTRACTS PAYABLE IN GOLD

———

## AN ARTICLE ENTITLED "CONTRACTS PAYABLE IN GOLD", BY GEORGE CYRUS THORPE, SHOWING THE LEGAL EFFECT OF AGREEMENTS TO PAY IN GOLD



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1933

Exhibit "C"
1-12

## SENATE RESOLUTION NO. 62

Submitted by Mr. Shipstead

In the Senate of the United States,
*April 17 (calendar day, April 24), 1933.*

*Resolved*, That the manuscript entitled "Contracts Payable in Gold", by George Cyrus Thorpe, showing the legal effect of agreements to pay in gold, be printed as a Senate document.

Attest.

Edwin A. Halsey,
*Secretary.*

ɪɪ

2-12

# CONTRACTS PAYABLE IN GOLD

———

By GEORGE C. THORPE, Washington, D.C.

Holders of commercial paper and parties to contracts, involving billions of dollars, stipulating for payment in dollars in gold, or "in American gold coin" or "in gold coin of the United States of or equal to the standard of weight and fineness existing" on a certain date, or "in gold and silver coin, lawful money of the United States", etc., are interested in the legal import of the qualifying phrases, in the face of present suspension of gold payments and the possibility of a depreciated currency.

In a recent English case, Mr. Justice Farwell, in chancery, has held, under a bond providing for payment of "the sum of 100 pounds sterling in gold coin of the United Kingdom of or equal to the standard weight and fineness existing" on the date of the bond, there was an obligation to pay 100 pounds in gold currency, satisfied by tendering 100 pounds in any form that was legal tender in England. (In re Societe Intercomunale Belge d'Electricite.)

A similar conclusion was reached in many American cases in State courts when their jurisdiction first was invoked to give effect to the effort of business men to avoid loss through compulsory acceptance of a tender of depreciated currency in payment of debts incurred for a gold consideration, in the era of the "greenbacks."

The laws of the United States recognize two kinds of money, namely coin and paper. The term "dollars in specie" means gold or silver coined dollars. "Dollars in currency" means dollars in notes or any paper money current in the community. (*Trebilcock* v. *Wilson* (1872) 12 Wall. 687, 20 L. Ed. 460.)

A Missouri contract of June 17, 1862, to pay "in the current gold coin of the United States, in full tale and count, without regard to any legal tender that may be established or declared by any law of Congress" was held satisfied by payment in the nominal value in any legal tender money. The court said that it was not a contract to be paid in bullion, or in so many pounds or ounces of gold, but in a certain number of dollars, in coin. The transaction did not regard gold as a commodity but as money. The Legal Tender Act had made Treasury notes of like value with gold. As a legal medium there could be no distinction between notes and gold. The theory of the suit brought on contracts payable in specific chattels is that the court's judgment is not for payment in articles in kind, but for the damages resulting to the creditor in consequence of breech of contract, and this judgment can be paid off and satisfied in whatever money the law has clothed with the attributes of legal tender. Although it was a notorious fact that for purposes of trade and in commercial transactions a difference was made between Treasury notes

**1**

and specie coin, whatever fluctuations might arise from extraneous causes, the debtor's right to pay in whatever medium he chooses could not be affected. In administering the law, it was necessary that gold and Treasury notes should be considered equal. (*Appel* v. *Woltmann* (1860) 38 Mo. 194.) A note payable "in gold" was held enforceable only for the face value of the note payable in any lawful money, and a judgment for a premium on gold in addition was declared invalid. (*Henderson* v. *McPike* (1864) 35 Mo. 255.)

A ground rent payable in "lawful silver money of the United States of America" was satisfied in Pennsylvania by payment of Treasury notes of the issue of February 25, 1862, the court saying that the addition of the word "silver" was merely descriptive of the "lawful money" and bound neither party. It meant simply a kind of lawful money in which the tender could be made, not a prohibition of other forms of money. It was declared that no party could exact, and no party consent to, a stipulation impugning the power of the law-making branch of the Government. (*Shollenberger* v. *Brinton* (1866) 52 Pa. St. 9.)

In another Pennsylvania case, the defendant promised to pay a certain number of dollars, "silver money of the United States, each dollar weighing 17 pennyweights and 6 grains at least." Upon the plaintiff's demand for a certain amount due in 1863, the defendant tendered Treasury notes of the issues of February 25, 1862, and July 11, 1862. The plea of tender "in lawful money of the United States" was sustained. (*Mervine* v. *Sailor* (1866) 52 Pa. St. 9.)

The decision was the same way in another action in Pennsylvania on a promissory note wherein there was a promise to pay a certain number of dollars "in gold, without defalcation", and the plaintiff demanded gold, or if the defendant had not the gold, that he would accept United States legal-tender notes, adding the premuim on gold, 33 percent. (*Laughlin* v. *Harvey* (1866) 52 Pa. St. 9, 30.)

In the same State, plaintiffs had deposited gold in the defendants' bank and received a certificate as follows:

—— has deposited in this office —— dollars, gold, payable to the order of herself on surrender of this certificate, in like funds, with interest.

On demand for gold, the defendants offered legal tender notes, which was held sufficient. (*Sanford* v. *Hays* (1866) 52 Pa. St. 9, 26.)

In a Pennsylvania action in assumpsit on a bank's promise to pay $14,145, the paper bearing on its margin "$14,145 specie", it was admitted that the consideration was gold and that "specie" meant payable in coin, gold or silver. A tender of legal tender notes was held good. (*Graham* v. *Marshall* (1866) 52 Pa. St. 9, 28.)

In assumpsit for money had and received, gold having been pledged as security, it was held that the damages should not include any premium on gold, and that, even if the action was in the form of trover only the value at the time of conversion could be allowed as damages. (*Frothingham* v. *Morse* (1864) 45 N.H. 545.)

In New York, the words "in specie, gold, and silver coin" were held not to effect the right to discharge an obligation, for the payment of a certain number of dollars, by paying in legal tender notes. (*Murray* v. *Harrison* (1867) 47 Barb. 484, affirmed (1868) 52 Barb. 427.) So also a bill of exchange payable "in specie or its equivalent" could be paid in legal tender notes called "greenbacks." (*Jones* v. *Smith* (1867) 48 Barb. 552.)

4-12

In an Indiana case, a contract for payment in gold also provided that if paid in paper the amount thereof necessary to purchase the gold at the place of payment would be required.  In sustaining a tender in paper money in the nominal amount of the debt the court said that when Treasury notes were made legal tender in payment of debts they were made the equivalent of coin as means of payment in all but the cases excepted by the law.  "This, and this only, is meant by making them legal tender."  For that purpose a Treasury note dollar could accomplish all that a gold coin dollar could accomplish, for by the law the latter would pay no more than $1 of indebtedness. The court could not know that its judgment would be paid in paper. There could be no warrant for a judicial assumption that the judgment debtor would discharge the judgment by payment in paper. Gold coin might be used.  The court could not know that paper money would not be withdrawn from circulation before satisfaction of the judgment.  (*Brown* v. *Welch* (1866) 116 Ind. 117.)

In Texas, a note made payable "in gold" was held dischargeable by the payment of legal tender notes; judgment on such a note could not be rendered for specie.  (*Shaw* v. *Trunsler* (1867) 30 Tex. 390.)

In the same State, the word "specie" in a judgment in an action on contract providing for payment of $500 in specie, or $894 in United States currency, was held surplusage that could be struck out on appeal.  (*Flournoy* v. *Healy* (1869) 31 Tex. 590.)

But the Supreme Judicial Court of Massachusetts was reversed in entering judgment for an amount in Treasury notes, equal in market value to the amount of coined gold reserved as rent in a lease wherein the contract provided for a yearly rent of 4 ounces 2 pennyweights and 12 grains of pure gold in coined money, the Supreme Court of the United States saying that the contract was for the payment or delivery of a specified weight of pure gold, solvable in coined money, and the judgment should have been entered for coined dollars and parts of dollars, instead of Treasury notes equivalent in market value to the value in coined money in the stipulated weight of pure gold.  (*Dewing* v. *Sears* (1871) 11 Wall. 379, 20 L.Ed. 189.)

Earlier, but after the passage of the Legal Tender Acts, the Supreme Court had sustained the proposition that express contracts to pay coined dollars could be satisfied only by the payment of coined dollars, and that such contracts were not "debts" which could be satisfied by the tender of Treasury notes.  (*Bronson* v. *Rodes* (1869) 7 Wall. 229, 19 L.Ed. 141.)

Our highest court said in another case that when it appears to be the clear intent of a contract that payment or satisfaction shall be made in gold and silver, damages should be assessed at the sum agreed to be due, in gold and silver coin, and judgment should be entered in coin for that amount.  (*Butler* v. *Horwitz* (1869) 7 Wall. 258, 19 L.Ed. 149.)

*Bronson* v. *Rodes*, supra, became the leading case, followed by later decisions in State courts.  But before that precedent there were decisions in State courts which enforced the qualifying phrase.

Thus under a contract to return gold, the promissor was held bound to return the things specified, as he would be bound to return a specific quantity of any other certain commodity.  The court's view was that "paper promises" having been substituted for a national money consisting of gold and silver coins, those metals had disappeared as

S-12

current money and no longer possessed the functions of national instruments of exchange, becoming merely articles of commerce, having the same characteristics and being liable to the same legal disposition as other articles of commerce when subject matter of contracts. (*Bank of Commonwealth* v. *Van Vleck* (1867) 49 Barb. 508.)

And a stipulation to pay rent "in American gold coin" could not be discharged by payment in legal tender notes of a nominally equal amount with the gold promised, unless it should happen that the notes were at par with American gold in the market. (*Myers* v. *Kauffman* (1868) 37 Ga. 600, 95 Amer. Dec. 367.)

A note given in August 1863 providing—

> Six months after date, without grace, for value received, I promise to pay to the order of A the sum of ———— dollars in gold coin of the standard value of 1860 of the United States of America, with interest at ————. And if said principal and interest is not paid in gold coin, as above stated, then, for value received, I promise to pay to the order of said A, in addition thereto, and as damages, such further amount and percentage as may be equal to the difference in value at ———— market between such gold coin and paper evidence of indebtedness of the States or of the United States that are or may be hereafter made a legal tender in payment of debts by the laws of this State or of the United States—

was construed as manifesting a first intention of the payee to secure a payment in gold if such payment could be enforced lawfully; and, secondly, if that could not be done, payment in legal tender notes at their value (at the place stated in the note) when converted into gold. (*Lane* v. *Gluckauf* (1865) 28 Cal. 288, 87 Amer. Dec. 121.)

The plaintiffs, depositors in defendants' bank, alleged a banking custom in the District of Columbia of receiving gold and silver coin and money currency to be returned in kind, separate entries being kept as to the classes of money deposited, and balances maintained as to those classes; in February 1864, having a balance in coin, they drew checks for coin which the defendants refused to pay in coin; that coin at that time was worth $1.57 in Treasury notes. Plaintiffs sought compensation in damages for injuries resulting by the defendants' refusal to pay the checks. Defendants plead: (1) That they did not promise as alleged, and (2) that, upon presentation of the checks, they offered to pay in Treasury notes made legal tender in payment of debts by the act of February 25, 1862.

The trial court excluded testimony offered to prove the alleged custom as to the difference in receiving and paying deposits in coin and paper money, and instructed the jury:

> If the jury find from the evidence that the defendants were bankers in 1861 and 1862 and that the coin mentioned in the declaration was deposited with said defendants as bankers, to be paid in coin, said deposit created a debt from the defendants to the plaintiffs which could be discharged by payment or offer to pay the same in legal tender notes; and if the jury further find that said tender was made, the plaintiffs are not entitled to recover."

In affirming judgment for the defendants, the Supreme Court said that the clear inference from the whole testimony was that the deposits were made without condition or special agreement of any kind, and that in such cases the law was well settled that the depositor parts with title to his money and loans it to the bank, and the transaction is not affected by the character of the money in which the deposit is made. The bank becomes liable for the amount of the debt, which can be discharged by such money payment as is by law a legal tender. (*Thompson* v. *Riggs* (1867), 5 Wall. 663, 18 L.Ed. 704.)

However, the court also said that contracts between a banker and his customers doubtless are required to be performed, and must be construed in the same way as contracts between other parties.

When the banker specially agrees to pay in bullion or in coin he must do so or answer in damages for its value; and so if one agrees to pay in depreciated paper the tender of that paper is a good tender, and in default of payment the promisee can recover only its market value and not its nominal value.   (Some case.)

All of these American decisions were rendered long before the enactment of the Parity Act of 1900, providing that—

The dollar, consisting of 25.8 grains of gold nine-tenths fine shall be the standard unit of value, and all forms of money issued or coined by the United States shall be maintained at a parity of value with this standard, and it shall be the duty of the Secretary of the Treasury to maintain such parity.

This has not been repealed.   Other existing statutes provide:

(a) The gold coins of the United States shall be legal tender in all payments at their nominal value when not below the standard weight and limit of tolerance provided by law for the single piece, and, when reduced in weight below such standard and tolerance, shall be legal tender at valuation in proportion to their actual weight.   (R.S., sec. 3585.)

(b) Silver dollars coined under the act of February 28, 1878, together with all silver dollars coined by the United States of like weight and fineness prior to the date of such act shall be a legal tender, at their nominal value, for all debts and dues, public and private, except where otherwise expressly stipulated in the contract.   But nothing in this section shall be construed to authorize the payment in silver of certificates of deposit issued by the Secretary of the Treasury for deposits of gold bullion.   (Act Feb. 28, 1878, c. 20, sec. 1, 20 Stat. 25.)

(c) The silver coins of the United States in existence June 9, 1879, of smaller denominations than $1 shall be a legal tender in all sums not exceeding $10 in full payment of all dues, public and private.   (Act June 9, 1879, c. 12, sec. 3, 21 Stat. 8.)

(d) The minor coins of the United States shall be a legal tender, at their nominal value, for any amount not exceeding 25 cents in any one payment. (R.S. sec. 3587.)

(e) Various commemorative silver and gold coins (50-cent piece, gold dollar and gold $2.50 pieces), coined at the mints of the United States under authority of law, are a legal tender in any payment to the amount of their face value. (Various statutes compiled in section 461 of title 31 of the U.S. code.)

(f) Gold certificates of the United States payable to bearer on demand shall be legal tender in payment of all debts and dues, public and private.   (Act Dec. 24, 1919, c. 15, sec. 1, 41 stat. 370.)

(g) United States notes shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States, except for duties on imports and interest on the public debt.   (R.S. sec. 3588, derived from statutes passed in 1862 and 1863.)

(h) Demand Treasury notes authorized by the act of July 17, 1861, chapter 5, and the act of February 12, 1862, chapter 20, shall be lawful money and a legal tender in like manner as United States notes.   (R.S. sec. 3589, derived from acts of 1861 and 1862.)

(i) Treasury notes issued under the act of July 14, 1890, chapter 708, shall be a legal tender in payment of all debts, public and private, except where otherwise expressly stipulated in the contract.   (Act July 14, 1890, c. 708, sec. 2, 26 stat. 289.)

(j) Treasury notes issued under the authority of the acts of March 3, 1863, chapter 73, and June 30, 1864, chapter 172, shall be a legal tender to the same extent as United States notes, for their face value, excluding interest: Provided, That Treasury notes issued under the act last named shall not be a legal tender in payment or redemption of any notes issued by any bank, banking association, or banker, calculated and intended to circulate as money.   (R.S. sec. 3590, derived from acts of the dates stated in this section.)

Is there anything in the legislation subsequent to the decision in Bronson v. Rodes, supra, which would require a different decision as

to the legal import of such phrases as "dollars payable in gold coin", etc.?

In forming its opinion on the meaning of that phrase, the court found it "necessary to look into the statutes regulating coinage". After reviewing such statutes as it deemed pertinent to the inquiry concerning the import of the quoted phrase, it concluded that the contract for payment in gold should be enforced.  The assertions in the court's opinion that: (a) Gold and silver coins are legal tender in all payments; (b) there are two descriptions of money in use, authorized by law, and both made legal tender in payments; and (c) the statute denomination of both descriptions is dollars, but they are essentially unlike in nature, the coined dollar being a piece of gold or silver of a prescribed degree of purity and weighing a prescribed number of grains, and the note dollar being a promise to pay a coined dollar though not a promise to pay on demand or at any fixed time, or, in fact, convertible into a coined dollar, are equally true at the present time, within the letter of the above-quoted statutes relating to legal tender, without regard to the parity act.

Does the parity act, quoted above, make specie and currency equivalent if in fact one or the other should become depreciated in actual market value?

The court said, that case, that it was "impossible, in the nature of things, that these two dollars should be actual equivalents of each other", and that there was nothing in the Currency Acts "purporting to make them such."  How far they were from being actual equivalents had been stated earlier in the opinion, i.e., $1 in coin equivalent to $2.25 in United States notes.

Under similar circumstances in the future the court still could say, "It is impossible, in the nature of things, that these two dollars should be actual equivalents of each other"; but could it say that there is nothing in the currency laws "purporting to make them such", in view of the parity act?

The parity act does not declare that all forms of money issued or coined by the United States are at a parity of value with the standard gold dollar, for that would be declaring to be a fact that which is not, or may not be, the fact, or cannot be the permanent fact.  Value is purchasing power and that in turn implies varying degrees of willingness of holders of consumable commodities to exchange them for money.  If both coin and currency are in circulation, the holder of a commodity desired by different groups of persons, one group possessing specie and the other group currency, will surrender in exchange for money a larger quantity or a better quality of the commodity for, say, specie, than for currency, of equal nominal amounts.  No law declaring parity can achieve actual equal acceptability, or purchasing power.  And so the parity act, in declaring that "all forms of money issued or coined by the United States shall be maintained at a parity of value with" the standard gold dollar, might be construed as the declaration of a policy or a mission, and the concluding clause, "it shall be the duty of the Secretary of the Treasury to maintain such parity", as the definition of a duty.

When gold is unobtainable and currency in circulation, can it be said that specie and currency are at a parity?  When both specie and currency are in circulation in such proportions that the citizens much prefer specie and actually will pay a premium therefor, can it

be said that these two kinds of money are at a parity of value with the standard gold dollar?  If the Parity Act can be said to purport to make the two kinds of money actual equivalents of each other, but if as an actuality the two kinds of dollars are not, or may not be, equivalents, will the Supreme Court's judgment be the same, as before the passage of the Parity Act, if called upon to construe the legal import of promises to pay in specie?  May it not again refuse to "suppose that it was intended by the provisions of the Currency Acts" and the Parity Act of 1900, "to enforce satisfaction" of a contract to pay in coin  "by the tender of depreciated currency of any description equivalent only in nominal amount to the real value of the bullion or of the coined dollars", as in *Bronson* v. *Rodes*, supra?

Or shall we hear that the Parity Act is the declaration of something which must be accepted as fact, even though that be contrary to the operation of economic laws?

The power to issue currency is not specifically given in the Constitution, the express authority to "emit bills" originally in the "Resolutions" before the Constitutional Convention having been stricken out on motion after considerable debate.  Daniel Webster said in the Senate in 1836 that although no express prohibition from making anything but gold and silver a tender in the payment of debts is applied to Congress, yet as Congress has no power granted to it in that respect but to coin money and regulate its value and that of foreign coin, it clearly has no power to substitute paper or anything else for coin as a tender in payment of debts and discharge of contracts.  (Webster's Works, vol. 4, p. 271.)  For the first 70 years of this Government's existence there was no national currency, all transactions of the Government having been in gold and silver coin. Paper currency used in private transactions consisted almost entirely of bank notes issued by numerous independent corporations variously organized under State legislation, of various degrees of credit and very unequal resources, administered often with great and not infrequently with little skill, prudence, and integrity.  National laws prohibiting the receipt or disbursement of anything except gold and silver in the transactions of the Government and State laws requiring the exemption of bank notes in coin on demand prevented the disappearance of gold and silver from circulation.  (See *Veazie Bank* v. *Fenno* (1869) 8 Wall. 533, 19 L. Ed. 482.)  As a matter of history, paper money in the shape of bills of credit was issued by the Colony of Massachusetts about 1690 to pay the Army returning unexpectedly from a disastrous expedition against Canada.  All the Colonies, at various times, followed this example.  Sometimes these bills were made legal tender in the payment of all debts.  Some bills were receivable in all payments of taxes and dues to the Government.  Some were nominally payable in specie.  Generally a certain fund was pledged for their redemption.  But some were issued on the mere credit of the issuing Government.

Although the power to issue currency was not expressly given to Congress by the Constitution, Congress has found the power implied and has called it into full activity since 1861 in undertaking to supply a national currency for the entire country.  It has made currency receivable in payment of debts to itself; has provided for its redemption and its uniformity in description and value.  (See *Veazie Bank* v. *Fenno*, supra.)  To the enumeration of the powers of Congress is

9-12

added that of making all laws which shall be necessary and proper for carrying the enumerated powers into execution, and all other powers vested by the Constitution in the Government of the United States, or in any department or officer thereof.   (United States Constitution, art. 1, sec. 8, cl. 18.)   The "sound construction of the Constitution must allow to the National Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in a manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."   (*M'Culloch* v. *State of Maryland* (1819) 4 Wheat. 316, 4 L. Ed. 579.)

So Congress has the implied power to issue currency and to provide for uniformity in description and value of its currency, as well as the express power to coin money and regulate the value thereof; but do those powers include the power to make the coined money, the value of which it can regulate, the exact equivalent of its currency, for the uniformity in description and value of which it can "provide"?   Is this third power implied as "necessary" within the doctrine of *M'Culloch* v. *Maryland*?

The regulation of the value of coined money consists in fixing the classes of coins that shall be issued and a standard of measurement of specie.   Similarly, it is possible to classify bills or notes issued or to be issued and to declare the Government's promises as to their redemption and their receivability by itself in governmental transactions or in the payment of debts.   For some 70 years of the Government's existence Congress acted under only one of these powers—that of coining money and regulating its value.   Then it acted upon the other power—that relating to currency.   The exercise of these different powers resulted in two kinds of national "money":   (See *Bronson* v. *Rodes,* supra).   But they did not produce two kinds of money of equal value—equal acceptability, equal purchasing power. Between 1862 and 1866 the premium on gold rose and fell from 30 to 160 percent.   (See *Shollenberger* v. *Brinton* (1866), 52 Pa. St. 9, 33.) If "money" is the medium for effecting exchanges and is a measure of value, when the law made both specie and currency legal tender, without actual equal purchasing power, gold became a mere commodity or article of commerce (see *Bank of Commonwealth* v. *Van Vleck,* supra) since it had inherent value as a metal, while currency had no inherent value, only conceptional value as ideal money.   But a uniform medium of exchange is essential to the commerce and prosperity of every civilized and commercial people.   Money as such is of value, or is in demand, not because it is more valuable than the quantity of property it will purchase, but because it readily can be exchanged for any article. (See *Brown* v. *Welch,* supra).   The existence of two kinds of money, lacking uniformity of exchangeability, created an impossible situation, or, at least, a situation which tended to nullify the purpose of the legal tender laws.   Obviously, some law was necessary to integrate the currency and legal tender laws.

The enumerated power from which the power to pass such a law as the parity act may be thought to be implied is, of course, the power

to coin money and regulate its value.  The end sought to be accomplished is to maintain as "money" that which Congress expressly is empowered to coin, for that power is to "coin money" and not merely to stamp coins.  The parity act became necessary in order to maintain the circulation of specie as money and in order effectively to regulate the value of coined money.  The end sought to be accomplished by the parity act, therefore, is legitimate and within the scope of the Constitution.  The parity act is an appropriate means plainly adapted to the end in view, i. e., to standardize money for use as a national medium of exchange.  It is only by virtue of law that gold coin is money or legal tender; it is only by virtue of law that paper notes are money or legal tender; and it is only by virtue of law that either coin or paper has a declared value; and only by virtue of law can coin and paper be maintained at a parity in order to afford a proper medium of exchange.  A parity law therefore is a necessary complement to the currency laws.

The ultimate ownership of all property is in the State; individual so-called "ownership" is only by **virtue** of Government, i. e., law, amounting to mere user; and use must be in accordance with law and subordinate to the necessities of the State.  The fact that citizens, at a given time, may prefer specie to currency, or vice versa, can not prevent Congress from enacting those laws which it deems necessary to the maintenance of a proper monetary system.  If the law makes specie and currency equivalent for purposes of payment, a failure to pay a given sum in specie, according to contract, cannot possibly beget an obligation to pay a greater sum in legal-tender notes, whatever premium men may choose to give for gold, when forced to obtain it for a specific purpose, or when impelled by a spirit of speculation, or by distrust of Government.  (*Brown v. Welch*, supra.)

While the courts cannot control our citizens' preferences for one kind of money over another kind, or prevent them from giving a premium for the one or the other kind of money, when the fiscal affairs of the Government necessitate the adoption of a certain policy, expressed in constitutional legislative enactment, such as the maintenance of a monetary system consisting of specie and currency, to be acceptable interchangeably as to the value of the dollar, the courts should not give effect to a stipulation impugning the power of the legislature to make such laws, and should not apply those laws to the construction of contracts in such a way as to defeat the legitimate purposes of those laws, upon the enforcement of which the very existence of the Government may depend, or, at least, the aggregate well-being of the whole people is contemplated.

As it is not strictly correct to say that a contract is "invalid" merely because the courts will not enforce it, since enforcement may be withheld from valid promises because some provision of law prohibits enforcement, such, for example, as the statute of limitations, or the want of a legal consideration, valid contracts may be made and carried out between parties, without regard to legal limitations, so long as the jurisdiction of courts is not invoked to enforce the agreement.  But when judicial enforcement is sought, the courts must find all pertinent constitutional laws tacitly written into every contract they construe.

So a contract to pay dollars tacitly includes the laws of the United States defining "dollar" and regulating the value thereof and pre-

11-12

scribing its usability as money.   And a contract to pay dollars "in gold" or in any other form of money of the United States, tacitly incorporates into that contract the parity act declaring all forms of money issued or to be issued by the United States at a parity.   Hence, the courts, in construing such a contract, must read into that contract the parity act, and if the promisee brings an action on the contract, the defendant's plea that he has tendered in payment any money that is lawful tender under the laws of the United States, is good, since all forms of money are at a parity and the defendant's plea, in effect, is that he has tendered the equivalent of the thing promised.

Furthermore, although in *Bronson* v. *Rodes*, supra, the Supreme Court said that "when contracts made payable in coin are sued upon, judgments may be entered in coined dollars and parts of dollars", it is doubtful if it could so rule now, in view of the necessity of reading into the contract the parity act, for the court would be bound to recognize that dollars coined or issued by the United States are at a parity, from which it follows that judgments in all such cases must be for dollars, or for dollars and parts of dollars, without qualification as to coin or paper.   If the promise to pay so many dollars in gold be restated as two promises, one to pay dollars and the other to pay in gold coin, the courts must read into those two promises the existing pertinent laws at the time of the demand, and give judgment on the promise to pay dollars (which may be satisfied by payment or tender in any lawful money that is legal tender), and give no effect to the promise to pay in gold coin since under the laws the second promise adds nothing to the first promise.

In other words, the contract creates an obligation to pay dollars in gold, satisfied by tendering the stated number of dollars in any form that is legal tender in the United States.

O

12-12

Marlow
c/o 94 Tatum Road
Sarasota Florida

(34248)

Sam Gibbons Courthouse
U.S. Bankruptcy Court
801 N. Florida Ave, Suite 55
Tampa, Florida
33602

RDC 99

U.S. POSTAGE PAID
FCM LG ENV
SARASOTA, FL
34232
NOV 26, 22
AMOUNT
$2.64
R2304N117034-29